**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| _____ : | Civil Action No. 07-177 (FLW) |
| IN RE VONAGE INITIAL PUBLIC : | |
| OFFERING (IPO) SECURITIES : | **OPINION** |
| LITIGATION : | |
| _____ : | |

**Wolfson, District Judge**:

This multi-district securities litigation arises out of claims by (i) investors who acquired Vonage Holdings Corporation ("Vonage") common stock pursuant to Vonage's May 24, 2006 Initial Public Offering ("IPO") and were allegedly damaged by Vonage's false and misleading statements to the public, including statements in its Prospectus, which caused investors to purchase stock at artificially inflated prices; and (ii) investors who were Vonage customers and purchased shares of stock through a Directed Share Program prior to the issuance of the IPO. The first action was commenced in this jurisdiction on or about June 2, 2006. Currently, there are fourteen separate suits filed under this consolidated action. Pending before the Court are four separate motions for appointment of lead plaintiff in this matter. Movants Centurion Securities LLC ("Centurion"), Artur Guzhagin ("Mr. Guzhagin") and the Zyssman Group seek to be appointed as lead plaintiff to represent all investors. Unlike other movants, however, Directed Share Program Group ("Directed Share Group")

seeks to be appointed as a lead plaintiff for a second proposed class of investors who purchased Vonage stock through Vonage's Directed Share Program.

Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 77z-1 and 78u-4, these movants, in addition to their motion to appoint lead plaintiff, request the Court to consolidate all related cases, appoint lead counsel and liaison counsel.[1]  In addition, the Zyssman Group is moving to strike Mr. Guzhagin's expert declarations of retired Judge Arlin M. Adams and Professor Geoffrey C. Hazard, Jr.  For the reasons set forth herein, the Court appoints the Zyssman Group as the lead plaintiff; Zwerling, Schachter & Zwerling, LLP as its lead counsel; and Keefe Bartels as its liaison counsel.  The Zyssman Group's motion to strike is granted.

## BACKGROUND FACTS

The Court will only recount facts relevant to the instant matter, as alleged by plaintiffs in their Complaints.  Vonage is a Delaware corporation which maintains its principal corporate headquarters in Holmdel, New Jersey.  It sells products and services which are designed to enable its customers to make and receive telephone calls over the Internet. As of April 1, 2006, Vonage purported to have over 1.6 million subscriber lines and

---

[1]By Order dated July 26, 2007, the Court consolidated all related actions under the civil action number 07-177(FLW).

claimed that it was continuing to expand rapidly. On May 24, 2006, Vonage filed an amended registration statement on Form 10-12G/A and prospectus with the Securities Exchange Commission ("SEC"). In accordance therewith, Vonage registered 31.25 million shares of its common stock for sale at $17.00 per share. According to the Prospectus and the Registration Statement, the offering price of $17.00 was determined by negotiation with various underwriters, after considering several factors, including Vonage's financial condition, the market for Vonage's services and Vonage's future prospects.

In this case, Plaintiff investors allege that Vonage issued a series of false and misleading statements to the public via the media. They further allege that Vonage's Registration Statement and Prospectus caused investors to purchase stock through the May 24, 2006 IPO at artificially inflated prices. Particularly, Vonage sold 31.25 million of its common stock and raised approximately $531 million in its IPO. Immediately thereafter, shares of Vonage stock plunged, allegedly upon revelations in the market of serious defects in the offering procedures as well as previously undisclosed material information. Indeed, the price of Vonage stock plummeted on the first day of trading, closing at $14.85 per share compared to its offering price of $17. The next day, the stock furthered declined, closing at approximately $13. The stock prices continued to decline, and at one point, were as low as $3.00 per

share.  Due to allegedly significant losses and their allegations of Vonage's misrepresentations, investors initiated suit against Vonage.

In addition to the investors who purchased Vonage's common stock during the IPO, a group of investors, prior to the IPO, purchased Vonage stock from Vonage's Directed Share Program ("DSP").  The DSP was a marketing device whereby Vonage offered its phone customers shares in Vonage's IPO in advance of the IPO's effective date of May 24, 2006.  Purportedly, Vonage needed to employ the DSP because of the lack of response to the IPO by institutional investors.  Thus, Vonage entered into direct sales of its common stock with Vonage phone customers, with the guarantee that such customers would be allowed to cancel their orders and that they would be kept informed by way of an internet link to Vonage's website.  On or about May 23, 2006, Vonage announced that the promised link to Vonage's new shareholder/phone customers did not work.  The DSP investors allege that the admission by Vonage, inter alia, is a violation of Section 5 of the Securities Act of 1993.  Thus, these investors, the Directed Share Group, also initiated suit against Vonage.

Fourteen related actions have currently been filed in this district on behalf of those investors who purchased or otherwise acquired the common stock of Vonage pursuant to Vonage's May 24, 2006 IPO.  The first action was commenced in this jurisdiction on

or about June 2, 2006.  Pursuant  to 15 U.S.C. §77z-4(a)(3)(A)(I), on the same day, the first notice that a class action had been initiated against Vonage was published over a widely circulated national business-oriented wire service advising members of the proposed class of their right to move the Court to serve as lead plaintiff no later than August 1, 2006.  Subsequently, at least twenty-one other similar notices were published nationally by multiple law firms.  These notices informed potential class member investors of the pendency of these cases, the nature of the allegations, the deadline within which they may move for appointment as lead plaintiff, and related pertinent information.

Before the Court are four movants - namely, Centurion, the Zyssman Group, Mr. Guzhagin and the Directed Share Group - that have timely filed their respective motions seeking to be appointed as the lead plaintiff in this case.[2]  However, the Directed Share Group requests that the Court appoint it as a separate lead plaintiff solely for DSP investors.

*Artur Guzhagin*

Mr. Guzhagin, an individual investor, allegedly suffered the

---

[2]Four movants, namely, the Haber Group, Vonage Purchaser Group, The Vonage IPO Investors Group and Navaid Alam, have withdrawn their motions for appointment as lead plaintiff.  Since its withdrawal of its motion to be appointed as lead plaintiff, The Vonage IPO Investors Group has stated that it supports Centurion as the lead plaintiff in this case.  However, no authority exists for the Court to favor Centurion as lead plaintiff because of this support.

greatest loss. Currently, at age 25, Mr. Guzhagin is a chiropractic doctor in Minnesota. Mr. Guzhagin claimed an aggregate loss of $147,574, in connection with an investment of $1,361,091 in Vonage stock during the relevant class period.

*The Zyssman Group*

The Zyssman Group consists of a small related group. Its members are a married couple, Oded Zyssman and Aileen Zyssman; and Mr. Zyssman's investment vehicles, the Northside Company and Sabra Company. Mr. Zyssman claims, in an affidavit, that he made and continues to make all investment decisions for each member of the group. Hence, the group already has a well-established pre-litigation relationship. The Zyssman Group purchased an estimated 18,450 shares of Vonage stock and invested $313,650. It claims that its financial loss in the wake of this action is approximately $97,845.

*Centurion Securities LLC*

Centurion is a Manhattan-based proprietary securities trading firm. Centurion purchased a total of 623,755 shares of Vonage common stock pursuant or traceable to Vonage's IPO at prices as high as $17.13 per share - investing an aggregate of $7,300,748, net of brokerage commissions - and thereby allegedly sustained losses, net of brokerage commissions, of $89,343.

*The Directed Share Group*

The Directed Share Group consists of ten unrelated individual

investors, namely, Moses Greenfiled, who filed the Complaint on behalf of the group; Shlomo Fuhrer; Yvonne M. Kisiel; John R. Krahn; Chana Leser; Menashe Leser; Yoel Werczberger; Leslie Abel; Robert Calcagno; and Nathan Cohen.  Each member purchased stocks prior to the IPO and allegedly suffered losses.  In addition to the claims made by the investors of the IPO, the Directed Share Group alleges that it was damaged by Vonage's false statement regarding its online resources (i.e., online website) prior to Vonage's IPO. The group suffered losses amounting to approximately $67,670.

### PROCEDURAL HISTORY

Following the initial filing of the motions for appointment of lead plaintiff, on August 15, 2006, Centurion filed a motion to seek limited discovery of Mr. Guzhagin because of concerns involving how Mr. Guzhagin learned of the issues raised in the instant matter and the circumstances surrounding his first contacts with his counsel.  On February 21, 2007, the Court conducted a telephonic conference with respect to that motion, and  by Order dated February 23, 2007, the Court granted in part and denied in part the motion.  On March 13, 2007, pursuant to a Court Order, Mr. Guzhagin produced certain documents relating to his stock trades, and, on March 26, 2007, the parties took a one hour deposition of Mr. Guzhagin.  Thereafter, on April 10, 2007, the Court entered an Order directing all motions for lead plaintiff be re-filed under this consolidated civil action.  On July 25, 2007, the parties

appeared in Court for oral argument on these motions.

**DISCUSSION**

**I.  Appointment of Lead Plaintiff**

   A.  <u>Legal Requirement of the PSLRA</u>

   Pursuant to the PSLRA, the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members...." 15 U.S.C. § 77z-1(a)(3)(B)(I).  In determining who is the most adequate plaintiff, the PSLRA further provides that:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this Act is the person or group of persons that –
>
>> (aa) has either filed the complaint or made a motion in response to a notice . . . .;
>>
>> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>>
>> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 77z-1(a)(3)(B)(iii).  In other words, the PSLRA instructs courts to adopt a presumption that the most adequate plaintiff is the person or group of persons with the largest financial interest in the relief sought in the outcome of the litigation who also satisfies the requirements of Rule 23.  <u>See</u> <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 263-65 (3d Cir. 2001).  The

presumptive lead plaintiff must make a prima facie showing that it satisfies the requirements of Rule 23 (i.e., typicality and adequacy).  Id. at 265.

However, that presumption may be rebutted with proof that the presumptively most adequate plaintiff either will not fairly and adequately protect the interests of the class, or is subject to unique defenses that render such plaintiff incapable of adequately representing the class.  See 15 U.S.C. §§ 77z-1(a)(3)(B)(iii)(II) and 78u-4(a)(3)(B)(iii)(II); see Sinai Roth v. Knight Trading Group., 228 F.Supp. 2d 524, 530 (D.N.J. 2002)("The Third Circuit held that once the presumptive lead plaintiff is determined, any member of the purported class may seek to rebut the presumption").  As summarized by the Third Circuit:

> If (for any reason) the court determines that the movant with the largest losses cannot make a threshold showing of typicality or adequacy [pursuant to Rule 23], then the court should explain its reasoning on the record (so that the appellate courts will have an adequate basis for review) and disqualify that movant from serving as lead plaintiff.  The court should then identify the movant with the next largest loss, consider whether that movant will satisfy Rule 23's requirements and repeat this process until a presumptive lead plaintiff is identified.  See e.g., Raftery, 1997 WL 529533, at *2-4, 7 (identifying a presumptive lead plaintiff after disqualifying two movants with larger losses, one on grounds of atypicality and one on grounds of inadequacy).

In re Cendant Corp. Litig., 264 F.3d 201, 262 (3d Cir. 2001). Similarly, once "the presumption has been rebutted, the court must begin the process anew" by identifying which of the remaining

movants has the largest financial interest in the class's`
recovery. Id. at 268.

Here, there are three movants seeking to become the lead
plaintiff in this matter;  the Directed Share Group seeks to be
appointed as a lead plaintiff only for the proposed DSP group of
investors.[3]  The Court's analysis starts with determining which
movant receives the presumption under the PSLRA because it has the
largest financial loss.[4]

B.  Largest Financial Loss

Courts have discretion to appoint an investor with the largest
stake in the litigation.  See In re Cendant Corp. Litig., 264 F.3d
at 262.  The Third Circuit has concluded that "largest financial
interest" means the largest loss.  Id. at 223; see also In re Able
Labs Sec. Litig., 425 F.Supp.2d. 562, 567 (D.N.J. 2006).  However,
observing that "the Reform Act provides no formula for courts to
follow in making this assessment," the Third Circuit recommends

---

[3]The Court will discuss the Directed Share Group's position
later in this Opinion.

[4]Under the PSLRA, the movants in this matter had 60 days
from the date of the first published notice to move the Court to
appoint a lead plaintiff of the purported class.  15 U.S.C. §
77z-1(a)(3)(A)(i)(II).  Here, the earliest notice of a class
action regarding Vonage was published on June 2, 2006.  Thus, the
movants must move within 60 days of that date to be considered
timely.  None of the parties raised any issue with respect to the
timing or procedural element, section (aa), of the PSLRA.
Moreover, the Court finds that the parties have sufficiently
complied with those requirements.  Thus, the Court shall make the
appropriate merit determinations pursuant to other prongs of the
statute.

that, in cases that do not present a clear choice as to the largest financial interest, courts should also consider, <u>inter alia</u>, (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs.[5] <u>Id.</u> at 262.

Indeed, courts in this circuit have accorded the third element, the largest financial loss, the greatest weight. <u>In re Vicuron Pharms., Inc. Sec. Litig.</u>, 225 F.R.D. 508, 511 (E.D. Pa. 2004); <u>In re Able Labs Sec. Litig.</u> 425 F.Supp.2d. 562; <u>Janovici v. DVI, Inc.</u>, No. 03-4795, 2003 U.S. Dist. LEXIS 22315, at *38-39 (E.D. Pa. Nov. 25, 2003); <u>In re Am. Bus. Fin. Servs., Inc. Sec. Litig.</u>, 2004 U.S. Dist. LEXIS 10200, at *2-3 (E.D. Pa. Jun. 3, 2004); <u>A.F.I.K. Holding SPRL v. Fass</u>, 216 F.R.D. 567, 572 (D.N.J. 2003); <u>Sinai Roth v. Knight Trading Group</u>, 228 F. Supp. 2d 524 (D.N.J. 2002).

---

[5]During oral argument, Mr. Merrill Davidoff, Esq., counsel for Centurion, argued that the definition of "net funds" is unclear. Specifically, counsel questioned whether net funds include commissions. Mr. Stuart Berman, Esq., counsel for Mr. Guzhagin, suggested that net funds include sales of stocks. Although no reported cases have explicitly defined the phrase "net funds," a court in this district found that loss should be calculated based upon "the difference between the purchase price and sale price, or upon the number of shares held at the close of the Proposed Class Period multiplied by the mean trading value of . . . [the] common stock from the close of the Proposed Class Period." <u>In re: Party City Securities Litigation</u>, 189 F.R.D. 91, 105-06 (D.N.J. 1999). Further, the Court has found no case, either from this circuit or other circuits, which has considered commissions in the relevant loss calculation.

The following chart lists the movants in accordance with their claimed financial loss:[6]

| | | Loss | Investment |
|---|---|---|---|
| 1. | Mr. Guzhagin | $147,574 | $1,361,091 |
| 2. | The Zyssman Group | $97,845 | $313,650 |
| 3. | Centurion | $89,343 | $7,300,748 |
| 4. | Directed Share Group | $67,670 | $195,500 |

*1. Mr. Guzhagin*

There is little dispute that Mr. Guzhagin suffered the largest loss under the definition of the PSLRA.  He has allegedly suffered a total loss of $147,574 due to the plummeting prices of Vonage stock.  Although there was some question raised as to the origin of the funds Mr. Guzhagin used in purchasing his shares of Vonage stock, none of the other movants dispute his loss.  Accordingly, the Court will ascertain next whether Mr. Guzhagin has made a prima facie showing of typicality and adequacy under Rule 23.

The determination of whether Mr. Guzhagin has made a prima facie showing of typicality and adequacy is a product of the Court's independent judgment.  In re Cendant, 264 F.3d at 263-65.  The Court should consider the pleadings that have been filed, the

---

[6]There is little dispute with respect to the claimed financial losses of the movants.  In fact, all parties in their submissions to the Court concede the figures set forth in the chart.

movant's application, and any other information that the Court required to be submitted. Id. at 264. In making the prima facie determination of typicality, the court should apply traditional Rule 23 principles, including whether the circumstances of the movant with the largest losses "are markedly different or the legal theory upon which the claims [of that movant] are based differ[] from that upon which the claims of other class members will perforce be based." Id. at 265 (quoting Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988)); see also Georgine v. Amchem Products, Inc., 83 F.3d 610, 631 (3d Cir. 1996). Thus, typicality exists if claims "arise from the same event or course of conduct that gave rise to the claims of the other class members and are premised upon the same legal theory." In re Party City Sec. Litig., 189 F.R.D. 91, 107 n.13 (D.N.J. 1999); see also Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985)(typicality "permits the court to assess whether the class representatives themselves present those common issues of law and fact that justify class treatment").

Likewise, in making the prima facie determination of adequacy, a court should consider whether the movant "has the ability and incentive to represent the claims of the class vigorously, [whether he] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class." In re Cendant, 264 F.3d at 265 (quoting Hassine,

13

846 F.2d at 179); see also Georgine, 83 F.3d at 630 (stating that the adequacy of representation inquiry involves consideration of both whether the "interests of the named plaintiffs [are] sufficiently aligned with those of the absentees" and whether "class counsel [is] qualified and [will] serve the interests of the entire class").

Furthermore, in making the adequacy assessment, courts should consider two additional factors.  Courts should inquire whether the movant has demonstrated a willingness and ability to select competent class counsel and to negotiate a reasonable agreement with that counsel.  Id.  If the movant with the largest financial losses lacks legal experience or sophistication, or selects lead counsel plainly incapable of undertaking the representation, or if it negotiates a clearly unreasonable fee agreement with its chosen counsel, courts might conclude that the movant had failed to surmount the threshold adequacy inquiry.  Id.  Again, the question at this prima facie stage is not whether the court would approve that movant's choice of counsel, or the terms of its retainer agreement, or whether another movant may have chosen better lawyers or negotiated a better fee agreement.  Instead, the relevant question is "whether the choices made by movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all."  Id. at

266.

Another factor in making the threshold adequacy determination arises when the movant with the largest financial interest in the relief sought by the class is a group rather than a individual person or entity. A "group of persons" is explicitly allowed to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). This group of persons need not be related in some manner. In re Cendant, 264 F.3d at 266. Courts should generally presume, however, that groups with more than five members are too large to work effectively. Id. at 267.

Here, Mr. Guzhagin has made a prima facie showing of typicality. Mr. Guzhagin seeks to represent a class of purchasers of Vonage common stock who have identical, non-competing and non-conflicting interests. He satisfies the typicality requirement because, just like all other class members, he: (1) purchased or acquired Vonage common stock during the class period; (2) at prices allegedly artificially inflated by Vonage's allegedly materially false and misleading statements and/or omissions; and (3) suffered damages thereby. Furthermore, all the related actions, including Mr. Guzhagin's, assert the same claims against the same defendants during the same period of time. Thus, Mr. Guzhagin's claims are typical of those of other class members since his claims and the claims of other class members arise out of the same course of

15

events.[7]

Moreover, arguably, Mr. Guzhagin has made a prima facie showing of adequacy.  First, Mr. Guzhagin has claimed the largest financial interest of all the movants, so his financial stake in the litigation provides an adequate incentive for him to vigorously prosecute the action.  In re Milestone Sci. Sec. Litig., 183 F.R.D. 404, 416 (D.N.J. 1998).  Second, Mr. Guzhagin has demonstrated, at this juncture of the inquiry, his initial commitment and ability to protect the interests of the class.  He has pursued this matter by filing a timely lead plaintiff application, submitted documents in support of his application that demonstrated his financial interest and qualifications, including a certification, declaration, brokerage account statements and trade confirmations, and prepared for and participated in a court-ordered deposition.  Accordingly, the Court finds that Mr. Guzhagin should receive the statutory presumption under the PSLRA.

The Court now turns to the question of whether or not any of the other movants have rebutted that presumption.  Once the presumption has been established, the question is not whether another applicant might do a better job of protecting the interests of the class than the presumptive lead plaintiff.  Rather, the question is whether anyone can prove the presumptive lead plaintiff will not do a "fair[] and adequate[]" job.  In re Cendant, 264 F.3d

---

[7]None of the movants contest Mr. Guzhagin's typicality under Rule 23.

at 268.

Predominately, the Zyssman Group and Centurion challenge Mr.
Guzhagin's adequacy under Rule 23.  Both movants contend that:

> 1.  Mr. Guzhagin's counsel, Schiffrin, Barroway, Topaz &
> Kessler, LLP (the "Schiffrin Firm"), first obtained Mr.
> Guzhagin's identity and trading data, and then mailed him a
> package directly soliciting his involvement in this
> litigation.  Thus, before receiving that direct solicitation,
> he had never spoken to his counsel;
>
> 2.  His understanding, based on the materials his counsel sent
> to him, was that he had to timely return his PSLRA
> certification to counsel or risk becoming ineligible to share
> in any recoveries the class may later obtain;
>
> 3.  His initial and timely-filed PSLRA Certification was not
> fully signed, contained incorrect trading data and loss
> calculations, and misleadingly declared that he "reviewed the
> Complaint" and "authorizes its filing" when, in fact, he
> testified during this deposition that he thought he was
> authorizing "a future complaint" and that he "cannot recall"
> any complaint he purportedly reviewed; and
>
> 4.  He refuses to produce any of his brokerage documents
> beyond his trading confirmations (including even his account
> statements) which substantiate how he, himself, purportedly
> paid for his Vonage shares and how much he actually paid
> (including margin interest, as he testified his purchases were
> consummated on margin).

In light of the submissions, the Court also questions how Mr.
Guzhagin initially became aware of his rights to pursue litigation
against Vonage and the steps he took to secure counsel.  The
PSLRA's over-arching goal is to promote a client-driven litigation
and ensure that the client took the initial steps to pursue an
action arising under the PSLRA.  <u>See</u> <u>Sakhrani v. Brightpoint, Inc.</u>,
78 F. Supp. 2d. 845, 850 (S.D. Ind. 1999) ("The PSLRA was enacted
with the explicit hope that institutional investors, who tend to

have by far the largest financial stakes in securities litigation, would step forward to represent the class and exercise effective management and supervision of the class lawyers" (citing House Conf. Rep. No. 104-67 at 34-35, reprinted in 1995 U.S.C.C.A.N. 679, 733-34)); see also Laborers Local 1298 Pension Fund v. Campbell Soup Co., No.00-152, 2000 U.S. Dist. LEXIS 5481, at *6 n.4 (D.N.J. Apr. 24, 2000)(the spirit of the PSLRA seeks to replace lawyer driven litigation with client controlled litigation).

Thus, the Court's inquiry of whether Mr. Guzhagin is adequate hinges upon his willingness and ability to select competent class counsel. In re Cendant, 264 F.3d at 265. If Mr. Guzhagin lacks legal experience or sophistication, or selects lead counsel plainly incapable of undertaking the representation, the Court can conclude that he has failed to surmount the threshold adequacy inquiry. Id. After reviewing the record in this case, the Court finds that Mr. Guzhagin presumptive status has been rebutted because he is inadequate under the principles set forth by the Third Circuit.

During oral argument, the Court questioned Mr. Guzhagin's counsel, Mr. Berman, regarding the relevant dates and events prior to Mr. Guzhagin retaining the Schiffrin Firm.  Mr. Berman represented that Mr. Guzhagin received a direct notice of the class action from his firm in June 2006.  The certification which Mr. Guzhagin signed and returned was dated June 23, 2006.  Thereafter, he was contacted by the firm in July 2006 and, subsequently, signed

a retainer agreement on July 21, 2006.  Mr. Berman argued vehemently to the Court that Mr. Guzhagin knew what he was doing when he signed the certification accompanying the notice - that he had read the complaint, agreed with the facts and wanted to enter into the lawsuit and retain counsel.  However, the Court finds the sequence of events that transpired casts doubt on counsel's position.

According to Mr. Berman's representations and the record, the evidence overwhelmingly suggests that Mr. Guzhagin was first contacted by counsel by receiving a direct notice in the mail and not as a result of a general publication notice.  Thus, Mr. Guzhagin did not take the initial step of securing representation.  During his deposition, Mr. Guzhagin testified that he was "not sure" how his counsel found out about his loss status.  Guzhagin Dep. at 27:11-22.  He then testified that the notice sent by his counsel was the first he learned of any such lawsuit against Vonage:

> Q.  Okay.  And how did you learn of the lawsuit in which you've sought to become a lead counsel?
>
> Mr. Bermen: Objection to form. Answer.
>
> A.  I received a packager from Schiffrin & Barroway in which there was a copy of a complaint filed by Schiffrin & Barroway against Vonage.  There was a notice in there describing my options of what I could do.  And also, there was a certification in there where I'm - I would be allowed to choose a counsel.
>
> . . .

    Q.  Okay.  Was that the first you learned of the
lawsuit

    A.  That was the first I learned, yes.

    Q.  Okay.  And prior to receiving that package,
you did not know that there was a lawsuit.  Is that a
fair statement?

    A.   Fair statement.

    Q.  Okay.  And prior to receiving that package,
you had not requested a package of information about
the lawsuit that you didn't know existed; is that
correct?

    A.  That's correct.

Guzhagin Dep. at 15:16-22, 16:8-19.  In fact, when Mr. Guzhagin was

asked if he had spoken with counsel from the Schiffrin Firm prior

to receiving or sending back the certification, Mr. Guzhagin

conceded that he did not speak to any attorneys until after he had

returned the form.  Guzhagin Dep. at 34:16-35:11.  This fact is

supported by the mistakes that Mr. Guzhagin made when he initially

filled out the certification, albeit the mistakes were subsequently

corrected.[8]

---

    [8]It is noteworthy that Mr. Guzhagin's initial certification
was plagued with misinformation.  First, it was signed with a
"quick signature" while his subsequent amended certification
contained his full signature.  Next, the initial certification
contained misleading trading data and loss calculations by using
average, instead of actual trading prices (in Mr. Guzhagin's
amended certification, he stated that he "consolidated same-day
trades into a single lot and attempted to provide on [his]
certification the average price for the consolidated trade").
Moreover, the certification also misleadingly declared that he
"reviewed the Complaint" and "authorizes its filing" when, in
fact, he testified during his deposition that he thought he was
authorizing "a future complaint."  See Guzhagin Dep. at 63:8-20.

Particularly relevant, the content of the notice raises questions for this Plaintiff.  The notice contains the following language: "If you wish to retain our firm, please complete and execute the enclosed form of Certification."  <u>See</u> Schiffrin & Barroway Direct Notice at ¶ 4.  Then the notice goes on to read: "Should you choose not to return the Certification, you may remain an absent class member, retain other counsel or take other steps to protect your rights."  <u>See</u> Schiffrin & Barroway Direct Notice at ¶ 5.

For a non-lawyer, such as Mr. Guzhagin, he may have believed that he might be left out of the class entirely if he did not retain the Schiffrin Firm; and that by returning the certification, Mr. Guzhagin was effectively retaining the Schiffrin Firm as his counsel.  Nevertheless, Mr. Berman contends that Mr. Guzhagin did not retain the Schiffrin Firm until he signed a retainer agreement in July 2006, after sending the certification. Curiously, however, Mr. Guzhagin stated in his deposition that he signed a retainer agreement in June 2006, which was when he had signed his certification pursuant to the direct mail notice.  <u>See</u> Guzhagin's Dep. at 20:16-21:21.  Indeed, during his deposition, Mr. Guzhagin admitted that until the day before his deposition, he was not aware of his right to retain any firm other than the Schiffrin Firm - even after he had spoken with that firm.

> Q.  Are you aware that if you're appointed
> lead plaintiff, you can decide who represents you?  It

could be Schifrin & Barroway or it could be another firm.  Have you even been made aware of that fact before?

A.  Yes.

Q.  Okay.  In the preparation for your deposition; is that correct?  I'll tell you what.  Let me ask it differently.  Before yesterday, you were not aware of that fact; correct?

A.  I was aware that I could choose any company I wanted to represent me.

Q.  Were you aware of that if the court appointed you lead plaintiff, you could choose any company you – any leagal firm that you felt was adequate to represent the plaintiff class?

A.  Yes, I was aware.

Q.  When did you become aware of that?

A.  I was aware of that yesterday.

Q.  For the first time?

A.  For the first time.

Q.  Yesterday being March 25th, the day before your deposition today; correct?

A.  Correct.

See Guzhagin's Dep. at 62:1-63:7.

In light of the course of events, the Court is unconvinced that Mr. Guzhagin was fully aware of the situation prior to selecting counsel or that he is sophisticated enough to lead the litigation as Mr. Berman has suggested to the Court.  Accordingly, guided by In re Cendant, the Court finds that Mr. Guzhagin has failed to demonstrate the willingness and ability to select

22

competent class counsel, an important factor to consider.  In fact, to the contrary, it was counsel who selected him.  See In re Cendant, 264 F.3d at 267 ("if, for example, a court were to determine that the movant . . . with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the member[] . . . could not be counted to monitor counsel in a sufficient manner").[9]

      A corollary problem is that the notice, sent by the Schiffrin Firm, was an effort on the part of counsel to solicit Mr. Guzhagin's business.  Other movants contend that the notice was inappropriate under PSLRA and violated ethics rules.  On the other hand, Mr. Guzhagin cited certain cases to rebut that claim.  However, the cases cited by Mr. Guzhagin, regarding the sufficiency of his counsel's notice, involve supplemental notices directed by courts; such practice would be appropriate because it is judicially controlled and does not threaten to tilt the level of playing field anchoring the PSLRA.  Nevertheless, for the purpose of appointing the lead plaintiff, the Court need not make a determination of

---

[9]In In re Cendant, the Third Circuit cited and relied on a case arising out of Northern District of California, In re Quintus Sec. Litig., 201 F.R.D. 475, Slip Op. (N.D. Cal. 2001). In that case, the district court found that a movant for the lead plaintiff position did not otherwise satisfy Rule 23 because he had not "demonstrated that he is able effectively to select and retain counsel."  Id. at 30.

whether the notice is legally sufficient.[10]  While it may be argued that under the PSLRA a direct notice may be permissible, the notice, here, runs contrary to the purpose of the PSLRA for a client-driven litigation, because the notice sought to have purported members retain the Schiffrin Firm as counsel.  See 15 U.S.C. § 77z-1(a)(3)(PSLRA notices "be published, in a widely circulated national business-oriented publication or wire service . . . "); see Funke v. Life Financial Corp., No. 99-1187, 2003 U.S. Dist. LEXIS 1226, at *16 (S.D.N.Y. Jan. 28, 2003)("If the court were to order plaintiffs' counsel to solicit such a group, in addition to presenting ethical problems for the attorneys, it would be contrary to the purpose of the PSLRA, under which 'Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff'" (citation omitted)); see also Topaz Realty v. Northfield Labs., Inc., No. 05-1493, 2006 U.S. Dist. LEXIS 77613, at *9-10 (N.D. Ill. June 19, 2006) (declining to appoint investor group as lead plaintiff because such appointment would "'create[] powerful incentives for lawyers competing to represent the class to solicit clients and to create

---

[10]The parties dispute the credibility of Professor Geoffrey C. Hazard, Jr.'s opinion regarding the sufficiency of the notice sent to Mr. Guzhagin.  Centurion argues that Professor Hazard submitted a declaration in another PSLRA case with which Mr. Guzhagin's counsel was also involved and that declaration contradicts every substantive point in the present declaration filed with this Court.  As such, the Zyssman Group filed a motion to strike Professor Hazard's expert declaration, and the expert declaration of Arlin M. Adams.  During oral argument on July 25, 2007, the Court granted the motion to strike on the record.

misleading forms of notice under the PSLRA that prompt plaintiff 'to volunteer' as lead plaintiffs when they think they are merely providing notice to preserve their claims.'")(citations and internal quotation marks omitted)).[11]

Accordingly, the Court finds that Mr. Guzhagin is not able to adequately represent the class since, as stated above, the Third Circuit has expressly held that a movant's ability and willingness to secure counsel is a factor to consider in finding adequacy.[12] Based on the foregoing, Mr. Guzhagin's presumption as the lead plaintiff has been rebutted. Next, the Court will turn to the Zyssman Group, the movant with the second largest financial loss, to determine whether it has made a prima facie showing under Rule

---

[11]The Court notes that it did not undertake an analysis of the legal sufficiency of the notice because of the other aggravating circumstances surrounding Mr. Guzhagin's retention of his counsel. Had there only been the issue of the notice, the Court would have necessarily made the determination of whether the notice violated any ethics rules, which would thereby disqualify the Schriffrin Firm. However, such is not the case here and, thus, the Court will not make that determination.

[12]The Court is also concerned with the manner in which Mr. Guzhagin has been involved in this litigation. Mr. Guzhagin admitted that he had lost all of the documents that were sent to him by counsel prior to this litigation (i.e., the complaint, the certification which he signed, and the notice). In fact, Mr. Guzhagin was not informed that he had the obligation to preserve documents that are relevant to the subject matter of the suit until the day of his deposition. See Guzhagin's Dep. at 59:18-60:23. As such, the Court finds that this conduct further heightens the Court's concern with respect to Mr. Guzhagin's adequacy and sophistication as a lead plaintiff.

23.[13]

### 2.   The Zyssman Group

The Zyssman Group has shown that it is typical under Rule 23.
By reviewing the Zyssman Group's submissions, it appears that its
claims and the class's claims arise from the same alleged course of
conduct by Vonage (i.e., the alleged securities law violations in
connection with the IPO).  Further, the Zyssman Group and class
members, as demonstrated by the similar complaints filed, assert
similar violations of federal securities laws.

Additionally, the Zyssman Group has shown that it is adequate
under Rule 23.  The Zyssman Group's interests are aligned with the
interests of the other class members since it has a significant
financial stake in this litigation, and it is a victim of Vonage's
alleged fraud.  Further, the Zyssman Group contacted and retained
counsel to prosecute the litigation.  Prior to filing the group's
motion, Mr. Zyssman, on behalf of the group, executed a reasonable
retainer agreement with its proposed counsel and timely filed its
lead plaintiff motion, which demonstrate the group's adequacy as a
lead plaintiff.  See Smith v. Suprema Specialities, Inc., 206 F.

---

[13]The Court recognizes that the difference between the
Zyssman Group and Centurion's financial loss is less than
$10,000.  However, as the parties do not contest the financial
losses of each movant at this time, the Court is compelled by the
procedures set forth by the Third Circuit and other case law to
utilize financial loss as the primary indication in selecting
which movant receives the statutory presumption.  See In re
Cendant, 264 F.3d at 223; see also In re Able Labs Sec. Litig.,
425 F.Supp.2d. at 567.

Supp. 2d. 627, 633, 637 (D.N.J. 2002)(the execution of a retainer agreement is relevant to determining a lead plaintiff movant's adequacy). Accordingly, the Court will place the presumption on the Zyssman Group after finding Mr. Guzhagin is inadequate. The Court will now determine whether the presumption is rebutted by other movants.

Centurion mainly argues that because the Zyssman Group seeks to aggregate the losses of individual investors, none of whom, standing alone, has a loss as high as Centurion, the Zyssman Group should not be appointed as lead plaintiff. The Court disagrees. The Zyssman Group is a small, completely related group directed by Oded Zyssman. Mr. Zyssman, as the husband of group member Aileen Zyssman and sole owner of his investment vehicles, the Northside Company and Sabra Company, makes all investment decisions for the Zyssman Group. See Zyssman's Decl. Mr. Zyssman is directly impacted by and suffers the losses of each group member's investment in Vonage stock. Thus, the Court is satisfied that the Zyssman Group, for the purpose of being a lead plaintiff, functions as a single person, which, the Court finds, will be advantageous for the class as Mr. Zyssman is able to control the prosecution of this litigation and make unified decisions. See In re Milestone Sci. Sec. Litig., 183 F.R.D. at 418 (the court noted with approval that a single member, the husband, "owns, controls and/or has final decision-making authority" in the entities which composed the

27

group, and held that "[i]n this case, the 'group' serves the same statutory purpose as a 'person' - [it] provides a cohesive unit capable of unified decision-making" (citation omitted)).[14]

Moreover, Mr. Zyssman's profession for the last fifteen years has been acting as an investor for himself and the other Zyssman Group members.  Prior to that, he was a stockbroker.  Mr. Zyssman acted on his own initiative and sought to contact and retain counsel in order to pursue his rights in this action.  Accordingly, the Court finds that the other movants have failed to rebut the presumption placed on the Zyssman Group.  The Court's inquiry ends here and the Zyssman Group is appointed as the lead plaintiff in this matter.[15]

---

[14]Mr. Guzhagin argues that, at this juncture of the litigation, little is known about the Zyssman Group's backgrounds, relevant experience, investments in Vonage and their level of commitment to lead this litigation.  Contrary to his argument, the Court is satisfied that for purpose of appointing a lead plaintiff, sufficient information has been provided by the Zyssman Group, through a signed certification and other documents produced by Mr. Zyssman, permitting the Court to find the group to be adequate and typical under Rule 23.

[15]Although the Court need not consider Centurion's ability to be the lead plaintiff, the Court finds Centurion's main argument regarding its adequacy unpersuasive.  Centurion contends that because it is the only institutional investor, which Centurion argues is favored by the PSLRA, it should be appointed as the lead plaintiff.  The suggestion that Centurion is entitled to some preferential treatment as an institutional investor is misplaced.  The predicate of PSLRA's aim to encourage institutional investors to seek a more active role in securities class actions is explicit in the body of the statute - namely, that investors with the largest financial interest are the presumptively most adequate plaintiff.  Most often, institutions will have larger investments (than individuals) and, therefore, will suffer larger losses.  Contrary to Centurion's contention,

## II.  Appointment of Lead Counsel and Liaison Counsel

The approval of lead counsel pursuant to Section 21D(a)(a)(3)(B)(v) of the PSLRA is not governed by the same statutory guidelines which control the lead plaintiff determination.  See In re Milestone Scientific Sec. Litig., 187 F.R.D. 165, 175 (D.N.J. 1999).  The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the District Court.  See Id.  The "[a]pproval of lead counsel necessarily requires an independent evaluation of, among other considerations, the effectiveness of proposed class counsel to ensure the protection of the class." In re Party City, 189 F.R.D. at 73.

---

the PSLRA does not afford institutions a preference over other movants with greater financial losses.  See In re Am. Bus. Fin. Servs., Inc. Sec. Litig., No. 04-0265, 2004 U.S. Dist. LEXIS 10200, at *7 (E.D. Pa. June 3, 2004); Tanne v. Autobytel, Inc. 226 F.R.D. 659 (C.D. Cal. 2005); Reiger v. Altris Software, Inc., No. 98-0528, 1998 U.S. Dist. LEXIS 14705, at *4 (S.D. Cal. Sep. 11, 1998).  Moreover, if the Court were to accept Centurion's position, the procedures in which the Court must follow in appointing a lead plaintiff, as set forth by In re Cendant, would be rendered superfluous because in any case where there is an institutional investor, the Court would be inclined to appoint it as the lead plaintiff without regard to financial losses. Moreover, significantly, here are allegations that Centurion is atypical of the IPO investors as it is a market maker member of the Chicago Board Options Exchange, which subjects Centurion to unique defenses relating to reliance and obligations to buy and sell stock regardless of the alleged fraud committed by Vonage. See e.g., Tice v. NovaStar Fin., Inc., No. 04-0330, 2004 U.S. Dist. LEXIS 16800, at *25 (W.D. Mo. Aug. 23, 2004)(market makers found to be atypical because they are subject to unique defenses); In re Safeguard Scientifics, 216 F.R.D. 577, 582-83 (E.D. Pa. 2003).

In the instant case, the Zyssman Group seeks approval of its law firm of Zwerling, Schachter & Zwerling, LLP as its lead counsel, and the law firm of Keefe Bartels as its liaison counsel. By reviewing both firms' resumes, the Court is satisfied that proposed lead counsel is competent to represent the Zyssman Group because it has been involved in numerous securities litigations, as identified in its resume. See Zwerling's Resume. In fact, other courts have appointed the Zwerling Firm as lead counsel in other security litigations. See e.g., In re Telxon Corporation Securities Litigation, No. 98-2876, Memorandum and Order dated August 25, 1999 at p.39. (the Zwerling firm has "the requisite ability and expertise to prosecute and manage this litigation effectively"). Similarly, the law firm of Keefe Bartels, in its capacity as liaison counsel, is qualified and experienced to conduct this litigation. Accordingly, the Court approves the Zyssman Group's selection of its counsel; the Zwerling Firm is appointed as the lead counsel and the Keefe Bartels Firm is appointed as the liaison counsel.

## III. Appointment of a Separate Lead Plaintiff for the DSP investors.

The Directed Share Group requests that the Court appoint it as a lead plaintiff for a separate class of investors who purchased their Vonage common stocks through Vonage's Direct Share Program. While the Court, at this time, does not make the determination whether it should designate another class separate and distinct

from the Vonage IPO investors, the Court, nevertheless, finds the
Directed Share Group's position persuasive.  Because each member of
the Directed Share Group purchased Vonage stocks prior to Vonage's
IPO, allegations of a separate violation of Section 5 of the
Securities Act of 1933 was alleged in the Directed Share Group's
Complaint.  As such, it is conceivable that the DSP investors will
face defenses that are distinct to their claims.  In other words,
the typicality of the DSP investors is different from the class
that other movants in the present matter are seeking to represent.
See In re Nanphase Technologies Corp. Litigation, No. 98-3450, 1999
U.S. Dist. LEXIS 16171, at *17-18 (N.D. Ill. Sep. 30, 1999)("'the
presence of even an arguable defense peculiar to the named
plaintiff class or a small subset of the plaintiff class may
destroy the required typicality of the class'") (citation omitted).
Most importantly, for the purpose of settlement, it would appear
that the DSP investors' claims could be negotiated separately,
thus, more effectively.

However, with respect to the Directed Share Group's lead
plaintiff application, the Court, during oral argument, did express
concerns regarding the size and the unrelatedness of members of the
Directed Share Group.  See In re Cendant, 264 F.3d at 267 (courts
should generally presume that groups with more than five members
are too large to work effectively).  In light of that, the Court
questions whether the Directed Share Group is the appropriate lead

31

plaintiff for this proposed class of DSP investors.  Nevertheless, the Court will defer, until the certification stage, the decision whether the DSP investors should be a separate sub-class with its own lead plaintiff appointed.  The Directed Share Group may re-file its motion for lead plaintiff at the appropriate time, bearing in mind the Court's concerns.

## IV.  Conclusion

For the foregoing reasons, the Zyssman Group is appointed as the lead plaintiff; Zwerling, Schachter & Zwerling, LLP as the lead counsel; and Keefe Bartels as the liaison counsel.  The Directed Share Group may  re-file its motion for lead plaintiff during the class certification proceedings.  In addition, the Zyssman Group's motion to strike is granted.


Dated:  September 6, 2007


                                             /s/ Freda L. Woflson
                                            Freda L. Wolfson, U.S.D.J.