**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____   :          Civil Action No. 07-177 (FLW)
                                  :
IN RE VONAGE INITIAL PUBLIC
OFFERING (IPO) SECURITIES         :              **OPINION**
LITIGATION
_____:

**WOLFSON, District Judge:**

This multi-district securities litigation arises out of claims by (i) investors

who acquired Vonage Holdings Corporation ("Vonage") common stock pursuant

to Vonage's May 24, 2006 Initial Public Offering ("IPO") and were allegedly

damaged by Vonage's false and misleading statements to the public, including

statements in its Prospectus, which caused investors to purchase stock at artificially

inflated prices; and (ii) investors who were Vonage customers and purchased shares

of stock through a Directed Share Program prior to the issuance of the IPO.  The

first action was commenced in this jurisdiction on or about June 2, 2006, against

Vonage, its directors and officers[1] and various Underwriter Defendants

(collectively, "Defendants").[2]  Currently, there are seventeen separate suits filed

---

[1]

The individual defendants include Jeffrey A. Citron,  Michael Snyder, John S. Rego,
Peter Barris, J. Sandford Miller, Harry Weller, Sharon A. O'Leary, Betsy S. Atkins,
David Morton, Obit Gadiesh, John J. Roberts, Hugh Panero, and Thomas J. Ridge.

[2]

The Underwriter Defendants include Citigroup Global Markets Inc., Deutsche Bank
Securities Inc., UBS Securities LLC, Bear Stearns & Co., Inc., Piper Jaffray & Co., and

under this consolidated action.  The appointed lead plaintiff, the Zyssman Group ("Lead Plaintiff"), filed an Amended Consolidated Complaint (the "Amended Complaint") on behalf of all plaintiffs.  In the instant matter, Vonage and the Underwriter Defendants move to dismiss the Amended Complaint in its entirety. For the reasons set forth herein, the motions are **GRANTED** in part, and **DENIED** in part.  Specifically, Counts I - V are dismissed; however, Lead Plaintiff shall be given leave to amend the Amended Complaint with respect to its allegations regarding Vonage's fax service and intellectual property litigations consistent with this Opinion.  However, claims regarding churn rates are dismissed.  Count VI is dismissed and Vonage's motion with respect to Counts VII, VIII and IX is denied.

## **BACKGROUND**

Vonage is a Delaware corporation which maintains its principal corporate headquarters in Holmdel, New Jersey.  It sells products and services which are designed to enable its customers to make and receive telephone calls over the Internet. As of April 1, 2006, Vonage purported to have over 1.6 million subscriber lines and claimed that it was continuing to expand rapidly.  On May 24, 2006, Vonage filed an amended registration statement on Form 10-12G/A and prospectus with the Securities & Exchange Commission ("SEC").  In accordance therewith, Vonage registered 31.25 million shares of its common stock for sale at $17.00 per

---

Thomas Weisel Partners LLC.

share.  According to the Prospectus and the Registration Statement, the offering price of $17.00 was determined by negotiation with various underwriters, after considering several factors, including Vonage's financial condition, the market for Vonage's services and Vonage's future prospects.

In this case, plaintiff investors allege that Vonage issued a series of false and misleading statements to the public.  The crux of the investors' claims is that Vonage's Registration Statement and Prospectus caused them to purchase stock through the May 24, 2006 IPO at artificially inflated prices.  Particularly, Vonage sold 31.25 million shares of its common stock and raised approximately $531 million through its IPO.  Immediately thereafter, shares of Vonage stock plunged, allegedly upon revelations in the market of serious defects in the offering procedures as well as previously undisclosed material information.  Indeed, the price of Vonage stock plummeted on the first day of trading, closing at $14.85 per share compared to its offering price of $17.  The next day, the stock further declined, closing at approximately $13.  The stock prices continued to decline, and at one point before the Complaint was drafted, were as low as $3.00 per share.  Due to allegedly significant losses and their allegations of Vonage's misrepresentations, investors instituted suit against Vonage.

In addition to the investors who purchased Vonage's common stock through the IPO, a group of investors, prior to the IPO, purchased Vonage stock from

Vonage's Directed Share Program ("DSP").  The DSP was a marketing device whereby Vonage offered its phone customers shares in Vonage's IPO in advance of the IPO's effective date of May 24, 2006.  Purportedly, Vonage needed to employ the DSP because of the lack of response to the IPO by institutional investors.  Thus, Vonage entered into direct sales of its common stock with its phone customers, with the guarantee  that such customers would be allowed to cancel their orders and that they would be kept informed by way of an Internet link to Vonage's website.  On or about May 23, 2006, Vonage announced that the promised link to Vonage's new shareholder/phone customers did not work.  The DSP investors allege that this admission by Vonage, inter alia, is a violation of Section 5 of the Securities Act of 1993.  Thus, these DSP investors also initiated suit against Vonage.

<u>The Amended Complaint</u>

Seventeen related actions have currently been filed on behalf of those investors who purchased or otherwise acquired the common stock of Vonage pursuant to Vonage's May 24, 2006 IPO.  The first action was commenced in this jurisdiction on or about June 2, 2006.  On January 12, 2007, the Judicial Panel on Multidistrict Litigation transferred all of the related actions to this Court under 28 U.S.C. § 1407. By rulings dated February 5, 2007 and May 4, 2007, the Court denied certain plaintiffs' motions to remand their actions to state court.  By Order dated July 27, 2007, the Court consolidated the related actions, and appointed the

Lead Plaintiff and its counsel as lead counsel. The Amended Complaint was filed by the Lead Plaintiff on behalf of all plaintiffs on November 19, 2007. Specifically, Count I of the Amended Complaint alleges violations of Section 11 of the Securities Act, 15 U.S.C. §§ 77(k) against Vonage; Count II alleges the same violations against the Officer Defendants and the Director Defendants of Vonage; Count III alleges the same violations against the Underwriter Defendants; Count IV alleges violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77(1)(a)(2), against Vonage; Count V alleges the same violations against the Underwriter Defendants; Count VI alleges violations of Section 5 of the Securities Act, 15 U.S.C. § 77(e), on behalf of the DSP Plaintiffs, against Vonage; Count VII alleges violations of section 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77(1)(a)(1), on behalf of the DSP Plaintiffs; Count VIII alleges violations of Section 15 of the Securities Act, 15 U.S.C. § 77(o), against Vonage; and Count IX alleges the same violations against the Director Defendants.

<u>Lead Plaintiff's Allegations</u>

Lead Plaintiff asserts that Vonage's Registration Statements and Prospectus (collectively, the "Offering Documents"), through which Vonage registered and offered common stock, materially misrepresented Vonage's business by withholding from investors, such as Lead Plaintiff, information that they would consider important in choosing to purchase Vonage common stock based on the IPO. First,

Lead Plaintiff alleges that Vonage made certain misleading statements with respect to its subscriber line growth and average monthly churn rate.  Lead Plaintiff asserts that Vonage stated that it had experienced rapid subscriber lines growth while maintaining a low average monthly churn rate (i.e., rate of customer termination).  However, allegedly, Vonage's increase in subscriber lines and its low average monthly churn rate were not the result of increased line sales, higher customer satisfaction and/or low terminations, as suggested by Vonage in its Prospectus, but rather resulted from a corporate practice of refusing customers' cancellation requests.  Particularly, Lead Plaintiff alleges that at the time of the IPO, numerous customers had communicated to Vonage that they were not satisfied with Vonage's services.  In response, Vonage's management allegedly instructed the retention department to refuse cancellation requests in order to keep the average monthly churn rate down.  Instead, the customer was offered a "zero rate plan," which kept the customer with Vonage but at a monthly service payment as low as $4.99 and, in some instances, no monthly payment.  This practice had been in effect since at least the Fall 2005.  As a result, Lead Plaintiff claims that by keeping the average monthly churn rate down through deceptive corporate practices, Vonage showed an inflated number of subscriber lines.

Second, Vonage allegedly failed to disclose the truth about technical problems and fundamental deficiencies that were plaguing its services and products

at the time of the IPO, especially when Vonage's Prospectus boasted that the Company's success depended on its ability to provide reliable services. For example, Lead Plaintiff alleges that Vonage failed to disclose the inability of Vonage's VoIP technology to properly handle facsimile transmissions, i.e., facsimile transmissions using Vonage's technology platform were often either aborted in midstream, transmitted in a fashion which was illegible to the recipient or simply did not transmit .

Third, Vonage allegedly failed to disclose that Vonage's business depended upon the misappropriation of other companies' intellectual property. In particular, Lead Plaintiff asserts that AT&T filed a lawsuit against Vonage in Wisconsin alleging that Vonage was infringing one of its patents, and that Vonage continued to use the patent without entering into any licensing agreement (the patent covered technology relating to routing telephone calls over data networks like the Internet). Lead Plaintiff alleges that prior to the IPO, Vonage received notice that it was infringing on AT&T's intellectual property rights. Additionally, it is alleged that Vonage did not disclose in the Prospectus that it infringed on Verizon's patents. As a result, Lead Plaintiff claims that the statements in the Prospectus relating to intellectual property and patent litigation were materially false and misleading by failing to disclose that prior to the IPO, its competitors had already advised Vonage of their claims of patent infringement and of potential/threatened litigation.

Finally, with respect to the DSP, Lead Plaintiff alleges that because the website, wherein customers could obtain timely information regarding their conditional offers and withdraw their offers, was not functioning properly, many of the participants were denied their right to withdraw. Moreover, Vonage allegedly violated certain notice regulations set by the SEC.

Vonage (including its officers and directors) and the Underwriter Defendants join in moving to dismiss the Amended Complaint in its entirety.[3] Defendants' position with respect to the allegations pertaining to the Offering Documents is that none of the claims made by Lead Plaintiff are actionable because Lead Plaintiff has failed to allege a single fact that would render any of the challenged statements false. Defendants contend that Plaintiff simply attacks each statement at issue by citing other, unrelated information that was supposedly omitted and then claiming that investors were misled. Defendants further contend that Plaintiff's § 11 claims fail because the face of the Amended Complaint indicates that investor plaintiffs have not suffered harm from any of the alleged misstatements. In that connection, Defendants insist that Lead Plaintiff cannot attribute any portion of Vonage's stock price decline during the IPO to the alleged misstatements, and thus, investors have no damages.

---

[3]

The Court held oral argument on October 10, 2008.

With respect to the allegations of the DSP, Defendants maintain that Lead Plaintiff has failed to allege any illegal acts that would violate the SEC rules. Instead, the email and voicemail sent to the prospective investors of the DSP were valid and they conformed with all the regulation guidelines.

## DISCUSSION

### I.    Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted).  In Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 1968 (quoting Conley, 355 U.S. at 45-46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965. As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim

requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Phillips, 515 F.3d at 234 (quoting Twombly, 127 S.Ct. at 1965).

## II.    Counts I  - V: 15 U.S.C. § 77(k) and 15 U.S.C. § 77(1)(a)(2) Claims

"The primary innovation of the [Securities] Act was the creation of federal duties -- for the most part, registration and disclosure obligations -- in connection with public offerings." Gustafson v. Alloyd Co., 513 U.S. 561, 571 (1995); see also In re Adams Golf, Inc. Secs. Litig., 381 F.3d 267, 273 (3d Cir. 2004).  As relevant here, Section 11 concerns material misstatements or omissions in registration statements, while section 12(a)(2) concerns material misrepresentations in prospectuses and other solicitation materials.  Adams, 381 F.3d at 273.

Section 11 of the Securities Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement.  Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).  This section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.  Id. "If a plaintiff purchased a security issued pursuant to a registration statement, he

need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements." Id. Defendants bear the burden of demonstrating due diligence. See 15 U. S. C. § 77k(b). Section 11 places a relatively minimal burden on a plaintiff. Herman, 459 U.S. at 382.

A similar burden exists for a plaintiff under a § 12 claim. In re Suprema Spec., Inc. Sec. Litig., 438 F.3d 256, 269-70 (3d Cir. 2006). Section 12(a)(2) provides for civil liability against anyone who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading. . . ." 15 U.S.C. § 77l(a)(2). Like Section 11, Section 12(a)(2) is a "virtually absolute" liability provision that does not require an allegation that defendants possessed scienter. In re Suprema Spec., 438 F.3d at 270 (citations omitted). To state a prima facie claim under Section 12(a)(2), "the plaintiff must allege the purchase of securities pursuant to a materially false or misleading prospectus or oral communication." Id. (citations omitted). For analytical purposes, claims arising out of Sections 11 and 12 involve the same legal scrutiny. Moreover, since Lead Plaintiff alleges that both Vonage and the Underwriter Defendants "played a direct role in the IPO," the same legal analysis of the claims applies to

-11-

those defendants.

### A.     Heightened Pleading Requirements of Rule 9(b)

Fraud is not a necessary element to establish a <u>prima facie</u> claim under

Section 11 or Section 12(a)(2). <u>See</u> <u>Shapiro v. UJB Fin. Corp.</u>, 964 F.2d 272, 288

(3d Cir. 1992).   However,  claims under those provisions can be, and often are,

predicated on allegations of fraud.  <u>See</u>, <u>e.g.</u>, <u>Cal. Pub. Emples'. Ret. Sys. v. Chubb</u>

<u>Corp.</u>, 394 F.3d 126, 160 (3d. Cir. 2004).   Where the plaintiff grounds these

Securities Act claims in allegations of fraud -- and the claims thus "sound in

fraud"-- the heightened pleading requirements of Rule 9(b) apply.  <u>Id.</u> at 161-63;

<u>Shapiro</u>, 964 F.2d at 288-89.  However, the Securities Act claims do not sound in

fraud if ordinary negligence is <u>expressly</u> pled in connection with Sections 11 and 12

claims.  <u>In re Suprema Spec.</u>, 438 F.3d at 272.

Here, the Court finds that Lead Plaintiff must plead its Sections 11 and 12

claims under the heightened pleading requirements of Rule 9(b).  While Lead

Plaintiff did not allege a fraud claim based on §10(b) of the Securities Act,

nonetheless, because its claims allege intentional, knowing or reckless conduct,

these claims "sound in fraud," and therefore must be pled with particularity.  The

linchpin of Lead Plaintiff's action is the allegation that Defendants <u>knowingly</u> and

<u>intentionally</u> omitted certain information in the Offering Documents to mislead

potential investors.  Nowhere in the Amended Complaint does Lead Plaintiff allege

negligence.

Nevertheless, Lead Plaintiff argues that the Amended Complaint did not plead a state of mind, and that the allegations do not require intent.  Specifically, Lead Plaintiff vehemently argues that because the Amended Complaint is devoid of words such as "intentional" and "reckless," Rule 8 liberal pleading standards should apply.  In support of its contention, Lead Plaintiff cites to In re Ravisent Technologies, Inc., No. 00-1014, 2004 WL 1563024, at *13-14 (E.D. Pa. Jul. 13, 2004).  It contends that the court there held that the failure to include language such as "intentional" and "reckless" weighs against applying Rule 9(b) to § 11 claims. Lead Plaintiff misconstrues the holding in  In re Ravisent.  The court there held that plaintiffs had carefully drafted the complaint to plead negligence sufficient to avoid the heightened pleading requirements.  Id. at *13.  In that connection, the court reasoned that plaintiffs, in their complaint, expressly excluded any allegations of knowledge or scienter on the part of the defendants.  Id. at *14.

Likewise, Lead Plaintiff's reliance on In re WorldSpace Sec. Litig., No. 07-2252, 2008 WL 2856519 (S.D.N.Y. Jul. 21, 2008), is misplaced for similar reasons. There, the court held that the plaintiffs' allegations as to the defendants' intent were carefully couched in the language of negligence.  Id.  The complaint alleged that the defendants owed a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus, and the

Registration Statement and Prospectus were "negligently prepared," resulting in material misstatements and omissions. Id. at *5.

Here, there is no such express, or inferential, language of negligence in the Amended Complaint.  In fact, Lead Plaintiff's churn rate allegations brim with the types of wording and imputations classically associated with fraud.  For example, the Amended Complaint states: "retention department [instructed] to refuse cancellation requests in order to keep the average monthly churn rate down," see Consolidated Amended Complaint ("CAC"), ¶ 106; "directed not to let customers cancel their service to keep the average monthly churn rate down," Id., ¶ 109; "Vonage misrepresented its growth," Id., ¶ 111;  "[statements about growth and churn] were materially false and misleading because they failed to disclose . . . the truth," Id., ¶ 112; and compellingly, the Amended Complaint alleges that the discounting practice was implemented for the express purpose of "misrepresenting [Vonage's] growth." Id.

Moreover, Lead Plaintiff's fax allegations are similarly pled with intentional and knowing conduct by asserting that Defendants "failed to disclose the truth about technical problems and fundamental deficiencies that were plaguing Vonage's services and products at the time of the IPO."   Id., ¶ 114.   Lead Plaintiff's intellectual property allegations fare no better.  The Amended Complaint asserts that "the Prospectus failed to disclose that Vonage's business depended upon the

-14-

misappropriation of other companies' intellectual property." Id., ¶ 118. The Amended Complaint goes on to allege that despite this knowledge, "the statements in the Prospectus relating to intellectual property and patent litigation were materially false and misleading by omitting to disclose, prior to the IPO, its competitors had already advised Vonage of their claims of patent infringement and of potential/threatened litigation." Id. Clearly, these allegations are associated with knowing and intentional conduct and, thus, the Court has no basis to infer any negligence. See Cal. Pub. Employees Ret. Sys., 394 F.3d at 160 -161 ("Allegations sound in fraud where they are based on knowing and intentional conduct; where a pleading is completely devoid of any allegations that the defendants acted negligently"; and where the pleading alleges that offering documents were false and misleading or concealed key facts from the public); see Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004)(applying Rule 9(b) to Section 11 claims where "wording and imputations of the complaint are classically associated with fraud: that the Registration statement was 'inaccurate and misleading;' that it contained 'untrue statements of material facts;' and that 'materially false and misleading written statements' were issued"). Accordingly, Lead Plaintiff must plead with particularity with respect to Counts I - V.[4]

---

[4] During oral argument, Lead Plaintiff argued, unconvincingly, that the securities cases upon which Defendants rely with respect to the standard of pleading are cases that have both a section 10(b) claim, as well as a section 11 or 12 claim. Lead Plaintiff argued that because

In order to satisfy Rule 9(b), Lead Plaintiff must plead: "(1) a specific false representation of material fact; (2) knowledge by the person who made [it] of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." Shapiro, 964 F.2d at 284; see Cal. Pub. Employees' Ret. Sys., 394 F.3d at 163 ("to plead with particularity the 'who, what, when, and how' of each statement" must be alleged).  Candidly, Lead Plaintiff conceded that if the Court were to apply the Rule 9(b) standard, it has not satisfied the pleading requirements under Rule 9(b).[5]  In light of that concession and given that I find that Rule 9(b) pleading requirements adhere in this matter, Counts I - V are dismissed. However, the Court will nevertheless analyze each of the claims to determine whether Lead Plaintiff should be provided another opportunity to amend its Amended Complaint.

---

this case is solely brought under sections 11 and 12, the Court should not infer any fraud. The Court disagrees.  The Court's inquiry here focuses on the language of the allegations, and not on whether a separate section 10(b) claim has been pled.  Indeed, the Third Circuit has clearly held that the determination of the pleading standard pursuant to Rule 9(b) is predicated on allegations of fraud regardless of the type of the claims pled. Cal. Pub. Employees' Ret. Sys., 394 F.3d at 160; see, e.g., Ladman Partners, Inc. v. GlobalStar, Inc., No. 07-976, 2008 U.S. Dist. LEXIS 76670, at *31-34 (S.D.N.Y. Sep. 30, 2008). Accordingly, Plaintiff's argument is unavailing.

[5]

During oral argument the Court asked Lead Plaintiff's attorney, "Would you say to me, then, if I were to find that 9(b) applies, that you have not satisfied 9(b)?"  Counsel responded, "I would say, your Honor, that is correct.  We have not attempted to and we have not."  See Transcript dated October 10, 2008 at p. 6.

**B.     Churn Rate Allegations**

Lead Plaintiff alleges that Vonage made misstatements about its historical subscriber line growth and its customer base; those statements failed to disclose the then current practice of refusing customers' termination requests.  According to Plaintiff, despite customers experiencing problems with Vonage's service and attempts to cancel service, Vonage misstated its monthly churn rate based upon the implementation of the "zero rate plan."  As a result, Lead Plaintiff alleges that Vonage misled investors about its expected revenues.

When reviewing the Prospectus or Registration Statement, the Court must read the entire document as a whole.  In re Donald J. Trump Casino Sec. Litig. - Taj Mahal Litig., 7 F.3d 357, 377 (3d Cir. 1993); see also In re U.S. Interactive, Inc. Sec. Litig., No. 01-522, 2002 WL 1971252, at *7 (E.D. Pa. Aug. 23, 2002) (citing EP Medsystems Inc. v. EchoCath, 235 F.3d 865 (3d Cir. 2000))("Courts must avoid examining the alleged misstatements in isolation 'because accompanying statements may render them immaterial as a matter of law'").  After reviewing the Offering Documents, I find that Lead Plaintiff fails to allege any materially misleading or omitted statements regarding the churn rates that would render them fraudulent.

At the outset, Defendants argue that a customer receiving a discount is nonetheless still a customer, so those customers should properly be included in the calculation of the churn rate.  To support their position, Defendants rely on In re

Cytyc Corp. Sec. Litig., No. 02-12399, 2005 U.S. Dist. LEXIS 6166, at *65 (D. Mass. Mar. 2, 2005) for the proposition that pull-ins or deep discounts are actual sales which are treated no differently than any other sale.  However, the facts upon which that court based its holding involved recognition of revenues rather than the number of customers.  As such, this Court finds Defendants' argument unpersuasive.  Rather, customers retained by Vonage, either by receiving steep discounts or being on the "zero rate" plans, may in some instances be used to decrease the churn rate.  This is especially true when the churn rate is calculated by taking the average monthly customer churn for a particular period of time divided by the number of customers that terminated their service during that period.  See Prospectus at 7.  Therefore, if the number of terminated customers is low, undoubtedly, the churn rate will remain low.

To begin, Lead Plaintiff argues that Vonage's failure to specifically mention the "zero rate" plan misled investors about its expected revenues.[6]  Such allegations cannot sustain a Section 11 or Section 12 claim.  As courts have consistently held,

_____

[6]

Lead Plaintiff also argues that because Vonage's historical performance was misstated due to the omission of the "zero rate" plan, this precludes Defendants from relying on cases that require accurate reports of historical performance.  As discussed, infra, Lead Plaintiff's argument in that respect is insufficient to overcome materiality.  The Prospectus delineated financial data, see Prospectus at 54, that reflected Vonage's historical performance.  Lead Plaintiff cherry picks through the data and alleges one aspect of it is misleading without also alleging how this particular data materially affects Vonage's historical performance, especially in light of the fact that Lead Plaintiff does not dispute that the revenue per line basis accurately reflects any discounts Vonage may have provided to its customers.

accurate disclosure of historical performance is simply not a basis for liability based on the risk that future performance may deteriorate. <u>Zucker v. Quasha</u>, 891 F.Supp. 1010, 1014 (D.N.J. 1995) <u>aff'd</u>, 82 F.3d 408 (3d Cir. 1996)(dismissing claim that company should have disclosed adverse trend in customer returns because adverse trend in current quarter did not render historical return rate false or misleading and company made no projections that were false or misleading); <u>Carney v. Cambridge Tech. Partners, Inc.</u>, 135 F.Supp. 2d 235, 242 (D. Mass. 2001)(to the extent challenged statements were historical, they were accurate and not misleading; to the extent they were forward looking, they included adequate cautionary language to insulate against the risk of misleading investors). Moreover, to the extent Lead Plaintiff alleges that the historical statements were forward looking by way of projecting future revenues and trend, Vonage counters that it included adequate cautionary language to insulate against the risk of misleading investors.[7] Although

---

[7]

The following are excerpts of warning statements from the Offering Documents:

> Flaws in our technology and systems could cause delays or interruptions of service, damage our reputation, cause us to lose customers and limit our growth.

> Although we have designed our services network to reduce the possibility of disruptions or other outages, our service may be disrupted by problems with our technology and systems, such as malfunctions in our software or other facilities and overloading of our network. Our customers have experienced interruptions in the past and may experience interruptions in the future as a result of these types of problems. <u>Interruptions have in the past and may in the future cause us to lose customers and offer substantial customer credits, which could adversely affect our revenue and profitability</u>.

there is substantial explicit cautionary language regarding future success and revenues, the Court notes that because this is a motion to dismiss, the adequacy of these cautionary statements may present a fact question. Regardless, the law is clear, an accurate report of past successes does not contain an implicit representation that the trend is going to continue, and hence does not, in and of itself, obligate the company to update the public as to the state of the quarter in progress. In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1432 (3d Cir. 1997) (citing Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1202 (1st Cir. 1996)); Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993); In re Covergent Technologies Sec. Litig., 948 F.2d 507, 513-14 (9th Cir. 1991) (rejecting plaintiffs' contention that accurate reporting of past results "misled investors by

---

Prospectus at 11-12 (emphasis added).

We believe that telephony services revenue will continue to increase in 2006, as we expect an increase in the number of subscribers. However, we might not experience the same rapid growth as in prior years.

Prospectus at 32.

[C]ompetition or continued price decreases may require us to lower our prices to remain competitive, may result in reduced revenue, a loss of customers or a decrease in our subscriber line growth and may delay or prevent our future profitability.

Prospectus at 9.

Moreover, the cautionary language of the Offering Documents specifically warned investors that the "churn rate could increase in the future if customers are not satisfied with [Vonage's] service . . . . [I]f [they] are unsuccessful in retaining customers . . . [their] revenue could decrease." Prospectus at 13.

implying that [the company] expected the upward first quarter trend to continue throughout the year"); Zucker, 891 F.Supp. at 1015.  Furthermore, "[t]he fact that a company has reported accurately about past successes does not by itself burden the company with a duty to inform the market that the present circumstances are less positive."  Gross v. Summa Four, Inc., 93 F.3d 987, 992 (1st Cir. 1996).  Here, Lead Plaintiff only alleges that the financial information posted in the Offering Documents was misleading because the historical revenues tend to overestimate the expected revenues.

Most importantly, regardless of whether the historical performance is accurate, Lead Plaintiff fails to allege that the failure to disclose the number of customers being retained either by way of steep discounts or "zero rate" plan is material.  The Amended Complaint does not allege that Vonage's alleged corporate practice had a material effect on any of the company's financial data.  Likewise, the Amended Complaint does not allege that the practice had a material effect on Vonage's prospects for growth.  Indeed, to sufficiently allege facts that omitted information is material, a complaint must allege that there is a substantial likelihood that a reasonable shareholder would consider the omitted information important in making an investment decision.  See Twombly, 127 S. Ct. at 1974; see also In re Donald J. Trump, 7 F.3d at 369 ("For an omission to be deemed material, 'there must be a substantial likelihood that [its disclosure] would have been viewed by the

-21-

reasonable investor as having significantly altered the 'total mix' of information made available')(citations omitted).  Lead Plaintiff simply fails to allege the impact of the alleged corporate practice on the business.  Without such allegations, there is nothing to support Lead Plaintiff's conclusory assertion that omitting the information regarding "zero rate" plans or customer credits is materially misleading. See, e.g., In re Alamosa Holdings, Inc. Sec. Litig.,382 F.Supp.2d 832, 852 (N.D. Tex. 2005)(dismissing as immaterial a claim that a wireless communication provider allegedly inflated the number of subscribers it had by entering into contracts with 1,000 non-creditworthy subscriber); Danis v. USN Commc'n, Inc., 121 F.Supp.2d 1183, 1191 (N.D. Ill. 2000)(the plaintiff must show that defendant's alleged illegal corporate practice by inflating revenue through a practice of billing former customers for monthly recurring charges had a material impact on the company as a whole).

Indeed, there is no basis for Lead Plaintiff to aver that there is a material impact on the business because of the alleged wrongdoing.  Even assuming the allegations (i.e., failure to report customers on the "zero rate" plan distorts the number of customers and the churn rate) are true, the Prospectus explicitly reported Vonage's revenue on a per line basis, which Lead Plaintiff does not dispute.  This information would identify the impact of any discounting or customer credit practice since any rate reductions offered to subscribers would cause a drop in revenue and

a corresponding drop in the average revenue per line.  Clearly, even if there were

customers who paid no monthly fees, the average revenue per line would necessarily

decrease.  See Prospectus at 54 (identifying not only the customer churn rate, but

also the average monthly revenue per line on the same summary chart).

Accordingly, an investor could have drawn his/her own conclusions from those

figures and made an informed decision.  See Prospectus at 54; Goldstein v.

Quantum Health Res., Inc., No. 95-713, 1996 WL 813245, at *5-6 (C.D. Cal. Dec.

23, 1996)("when a company accurately discloses financial information, the market

is expected to draw its own conclusions").  In sum, these allegations pertaining to

the churn rates are not actionable under the Securities Act.

## C.    Fax Service Allegations

Lead Plaintiff alleges that Vonage's statements regarding its product and

technology platform were misleading by virtue of Vonage's omissions as to then-

existing facsimile problems.  Specifically, Lead Plaintiff alleges that Vonage, at the

time of the IPO, was experiencing significant and substantial problems with its

company's VoIP technology and could not adequately handle facsimile

transmissions.  Lead Plaintiff further alleges that these technological deficiencies

led to a class action lawsuit, Bustos v. Vonage America, Inc., which was filed five

days before the IPO, but was not disclosed in the Offering Documents.  The issue

arising from the allegations is whether Vonage had a duty to disclose the specific

technical deficiencies of its facsimile service despite a general disclosure of technological issues with the VoIP.[8]

First, Defendants contend that Plaintiff fails to allege any facts to suggest that any problems with Vonage's fax services were material because nothing in the Amended Complaint indicates that fax service was an important part of Vonage's business model or product line.  The Court is unconvinced by this argument.  By reviewing the Offering Documents, it is reasonable and conceivable that investors could have deemed the fax service an essential part of the service provided by Vonage's VoIP.[9]  In the "Our Market Opportunity" section of the Prospectus, Vonage touts that "VoIP communications are carried as data packets and require a broadband Internet connection that has sufficient bandwidth *to deliver the data uninterrupted* . . . [C]onsumers will increasingly look to use their high-speed Internet connections for more of their voice, video and *data* communications."  Prospectus at 2.  Additionally, the financial revenues reported in the Offering

_____

[8]

Another issue not germane to this particular analysis is Lead Plaintiff's allegations with respect to the Bustos Litigation.  During oral argument, Lead Plaintiff argued that aside from the fact that Defendants knew of the existence of the litigation, they deliberately omitted disclosure of the filing of the complaint in the Prospectus.  I rejected that position at oral argument by finding that the Bustos litigation was only pled to show that Vonage had knowledge of its allegedly substantial problems with the fax service.

[9]

In addition to the Amended Complaint, the Court may consider any materials "integral to or explicitly relied on in the complaint," as well as matters of public record.  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999)(citation omitted).

Documents presumably encompass premium service revenues, including fax numbers and services, that investors could have reasonablely relied on in making their decision.  See Prospectus at 1.  At the very least, the current record reveals that fax services have been prominently featured in the Prospectus.

Next, Defendants contend that, as a matter of law, where a company generally acknowledges a technical error or limitation, it does not have to also explain how that deficiency applies to a particular aspect of a product.  For support, Defendants cite to relevant portions of the Prospectus to show that there were multiple warnings regarding Vonage's VoIP technology.  For example, Defendants cite to the Prospectus which states "system disruptions or flaws in our technology" is one of the foremost risk factors associated with investing in Vonage.  Prospectus at 3.  Further, the Prospectus explained that Vonage's VoIP technology worked by converting voice signals into "data packets," which are then transmitted over the Internet and could be "delayed or lost."  Id. at 55-56.  The Prospectus also declared that the differences between Vonage's VoIP telephone service and traditional telephone service had in the past and may in the future cause Vonage's customers to experience poorer call quality and higher dropped-call rates than customers of traditional telephone companies.  Id. at 10-12. Cumulatively, Defendants assert, the Prospectus informed investors that Vonage's technology was not perfect and that no reasonable investor could possibly read those "general" warnings as applying to

everything <u>but</u> Vonage's fax service.  In that connection, Defendants claim that federal securities laws do not require disclosures about "technical deficiencies." They cite to numerous cases for the proposition that providing a "general warning" of technological deficiencies in the Offering Documents does not trigger a duty to also explain how these flaws might affect a particular service.  But those cases do not fully support Defendants' position.

Defendants primarily rely upon <u>Backman v. Polariod</u>, 910 F.2d 10 (1st Cir. 1990).  In that case, the First Circuit affirmed the dismissal of a claim that disclosures by Polariod about its Polavision instant movie camera - a product that ultimately proved to be a commercial disaster - were misleadingly incomplete.  The <u>Backman</u> court held that "a voluntary disclosure of information that a reasonable investor would consider material must be 'complete and accurate.'" <u>Id.</u> at 17.  The court went on to say, "this . . . does not mean that by revealing one fact about a product, one must reveal all others."  <u>Id.</u>  However, the court cautioned that the disclosure must not be "so incomplete as to mislead."  <u>Id.</u> (quotations omitted). Importantly, the court explained that "if management knew at the time of the report that Polavision was a commercial failure . . . [its failure to specifically so state] might well be found to be a material misrepresentation by half-truth and incompleteness."  <u>Id.</u> at 17-18.[10]  Here, this is the scenario, albeit not sufficiently

---

[10] Similarly, the following two cases are factually distinguishable from this case: <u>In re</u>

pled, that Lead Plaintiff appears to be suggesting.

Lead Plaintiff alleges that the warning statements contained in the Prospectus "failed to disclose the truth about technical problems and fundamental deficiencies that were plaguing Vonage's services and products at the time of the IPO." To show the extent and knowledge of such flaws, Lead Plaintiff points to the Bustos Litigation, a lawsuit challenging Vonage's fax service. At this juncture, giving Lead Plaintiff all favorable inferences, Vonage could have known, prior to the IPO, that its fax technology was so flawed that it would amount to a substantial and real disruption to its services.

Moreover, although a corporation has no general duty to disclose all technical issues, the keystone of the inquiry of whether a statement should have been included is its materiality. The Third Circuit has cautioned that "materiality is a relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it." In re Donald J. Trump, 7 F.3d at 369. "In other words, a particular misrepresentation or omission significant to a reasonable investor in one document or circumstance may not influence a

---

OPUS360 Corp. Sec. Litig., No. 01-2938, 2002 WL 31190157, at *8 (S.D.N.Y. Oct. 2, 2002)(the court found that the prospectus need not disclose that software was known to be a fatally flawed application because the investors were warned that the product was still being developed, and was still subject to further commercial testing); and In re Allscripts, Inc. Sec. Litig., No. 00-6796, 2001 WL 743411 (N.D. Ill. Jun. 29, 2001)(the court there held that plaintiffs failed to plead sufficiently that defendant company had a duty to disclose the average 50% customer return rate for a product because plaintiffs furnished no particularized statements about the technical defect of the product).

reasonable investor in another." Id.  Materiality is a mixed question of law and fact which the factfinder ordinarily decides.  See TSC, 426 U.S. at 450; Shapiro, 964 F.2d at 280 n.11.  The alleged misrepresentations or omissions would have to be "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality . . . for the district court to rule that the allegations are inactionable as a matter of law." Shapiro, 964 F.2d at 280 & n.11.  Accordingly, the Court cannot, at this juncture, determine that as a matter of law, no reasonable investor would deem the existence of a serious technical fax service issue, which ultimately led to a separate class action lawsuit in this District, to be unimportant and immaterial, especially when the Prospectus touted the benefits of Vonage's facsimile service.[11]  The Court nevertheless dismisses this claim because Lead Plaintiff has failed to plead with particularity; however, Lead Plaintiff shall be given leave to amend its Amended Complaint on this basis.

---

[11] Defendants argue that they had no knowledge of the filing of the Bustos litigation prior to the IPO issuing.  In support of the contention, Defendants assert that the Bustos Complaint was not served on Vonage until May 31, 2006 - one week after the IPO.  However, the relevant inquiry here is whether Defendants omitted facts that were known or knowable at the time of the offering.  In re Tellium, Inc., 2005 WL 1677467, at *13 (D.N.J. Jun. 30, 2005).  The Amended Complaint here referenced the time frame in which the Bustos litigation was filed, i.e., May 19, 2006.  Such reference was then followed by the claim that the Prospectus failed to mention the existence of the lawsuit. The logical inference is that the May 19th date was five days before the IPO, and therefore, Vonage knew or should have known that the Bustos litigation existed before the Offering Documents became published; whether or not Vonage in fact had knowledge is irrelevant for a Rule 12(b)(6) analysis.

### D.    Vonage's Intellectual Property

Lead  Plaintiff challenges Vonage's statements that its "network is based on internally developed software" and that it "also developed a number of software systems, such as a web-based system that provide [Vonage's] customers with valuable feature while simultaneously enabling [Vonage] to manage [their] business more efficiently" as misleading.  Compl., ¶ 119.  Lead Plaintiff's basis for claiming that these statements were misleading is the fact that Verzion, AT&T, and Klausner Technologies notified Vonage of their belief that Vonage's software infringed on those companies' patents, and that there was a possibility of future patent litigation. Compl., ¶ 131.  In other words, Lead Plaintiff asserts that by omitting this pertinent information, Vongage mislead its investors.

The crux of Defendants' response is that such omissions, i.e., notices from Verizon, AT&T, and Klausner that Vonage was infringing upon their patents, are not material because there is no duty to disclose a "potential lawsuit" or "possible future litigation" because it is too speculative.  Defendants cite to numerous cases to support their contention that Vonage had no duty to disclose the threats of litigation from Verizon, AT&T and Klausner.  In addition, Defendants cite to the Prospectus to show that adequate cautionary language was placed in the Prospectus to warn investors of potential intellectual property lawsuits.  Such language is as follows:

-29-

> We may be subject to damaging and disruptive intellectual property litigation.
>
> We have been named as a defendant in three suits currently pending that relate to alleged patent infringement . . . . In addition, we have been subject to other infringement claims in the past and may be subject to infringement in the future.  We may be unaware of filed patent applications and issued patents that could relate to our products and services.

Prospectus at p. 15.  The Prospectus then went on to describe in detail how intellectual property litigation could be time-consuming and expensive.  See Id.

Indisputably, with respect to a company's failure to disclose impending litigation, there is no requirement "to make disclosures predicting such litigation absent an allegation that the litigation "was substantially certain to occur during the relevant period." In re Citigroup, Inc. Sec. Litig., 330 F.Supp. 2d 367, 377-78 (S.D.N.Y. 2004); see also In re Par Pharm., 733 F.Supp. 668, 678 (S.D.N.Y. 1990); Ballan v. Wilfred American Educ. Corp., 720 F.Supp. 241, 248 (E.D.N.Y. 1989). Indeed, Third Circuit authority establishes that while pending litigation may be material under certain circumstances, the mere possibility of litigation is not. Gen. Elec. Co. By Levit v. Cathcart, 980 F.2d 927, 935 (3d Cir. 1992); see also, e.g., Prettner v. Aston, 339 F.Supp. 273, 287 (D. Del. 1972) (any statement regarding "the possibility of" litigation other than a pending or threatened legal proceeding "would have been wholly speculative and was not required");  City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1267 (3d Cir. 2001)("We therefore conclude that

Defendants cannot be held responsible for the failure to consider the cumulative effect of other, similar lawsuits that had not been filed and, as far as the pleadings establish, were not even threatened, at the time Defendants decided not to disclose the David's Litigation")(emphasis added); see also Bell Atlantic Corp. v. Bolger, 771 F.Supp. 686, 687 (E.D. Pa. 1991); Goldsmith v. Rawl, 755 F.Supp. 96 (S.D.N.Y. 1991); Fry v. Trump, 681 F.Supp. 252, 261 (D.N.J. 1988); Bertoglio v. Texas Int'l Co., 488 F.Supp. 630 (D. Del. 1980); Beatty v. Bright, 318 F.Supp. 169 (S.D. Iowa 1970) (all concerning the disclosure of pending lawsuits); Mills v. Esmark, Inc., 544 F.Supp. 1275, 1296 (N.D. Ill. 1982) ("Defendants cannot be held to a standard of disclosure which requires consideration of all possible contingencies"). But cf SEC v. Fehn, 97 F.3d 1276, 1291 (9th Cir. 1996)(where pending litigation would be material, a defendant company could be held liable for lack of disclosure, even where no lawsuits had yet been filed based upon those violations, because those violations could have spawned lawsuits that would have "represented a potentially large financial loss" for the company).

In light of these legal principals, Lead Plaintiff has not sufficiently pled facts to support its allegation of material omission with respect to these subsequent litigations. The Court approaches this analysis by first establishing the nature of the suits in question and whether there are allegations that these litigations were substantially certain to occur. As alleged, all three companies, Verizon, AT&T and

-31-

Klausner, repeatedly advised and warned Vonage prior to the IPO that Vonage was infringing upon their respective patents.  See Compl, ¶ 122 ("Prior to the IPO, AT&T also communicated to Vonage's counsel, in numerous meetings, letters and emails, that Vonage's services and products were infringing AT&T's intellectual property rights"); see Id. at ¶ 123 ("Prior to the IPO, Verizon claimed that Vonage was infringing on seven of Verizon's patents relating to VoIP technology"); see Id. at ¶ 127 ("Klausner Technology informed Vonage in January 2006 that Vonage was infringing one of its patents . . .").  However, nowhere in the Amended Complaint does Lead Plaintiff allege that Verizon, AT&T, and Klausner were initiating, or even threatened, litigation.  Rather, quoting Vonage's own Prospectus, Lead Plaintiff avers in a conclusory manner that claims of infringement or the enforcement of any of the patents would have a material impact on Vonage's business and share price.  Compl., at ¶ 130.  Thus, the Amended Complaint fails to plead that the lawsuits were substantially certain to occur during the relevant period of time.[12]  Simply put, Lead Plaintiff has only alleged a "possibility of litigation" rather than any pending or threatened legal proceeding, which in this Circuit is not

---

[12] Plaintiff referenced in the Amended Complaint a press release dated June 16, 2006, issued by Vonage, which announced the Verizon Lawsuit.  The release explicitly stated that Vonage had "not previously been notified by Verizon regarding the seven patents identified in the lawsuit."  See Press Release dated June 16, 2006.

actionable under the Securities Act.[13]

Nevertheless, while the Court is aware that a mere infringement notice does not constitute a threat of litigation in a patent context, see Amsted Indus. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed. Cir. 1994), the nature of the alleged notices given to Vonage is not clear from the face of the Amended Complaint.  In fact, the contents of the alleged emails, letters and meetings are not before the Court and, as such, there is no basis to definitively find that Lead Plaintiff could never plead this claim, especially since Vonage has, shortly after the IPO, acknowledged the existence of a lawsuit brought by Verizon.  Accordingly, Lead Plaintiff shall be given leave to amend this claim if it can allege in good faith that the events and writings before the issuance of the IPO make clear that litigation was substantially certain to occur.

### III.    Affirmative Defense of Negative Causation

While the Court has dismissed Counts I - V against Defendants, the Court

---

[13]

To the extent Plaintiff argues that the risk of infringement claims renders misleading Vonage's disclosure that it developed its software internally, the Court finds Lead Plaintiff's argument unavailing.  Patent law provides an inventor with protection against persons who appropriate his/her inventions and also provides the inventor with protection against persons who develop the same invention independently.  See Russell v. Trimft, Inc., 428 F.Supp. 91, 93 (E.D. Pa. 1977).  Even if Vonage's software did infringe another company's patent, that fact alone does not render Vonage's statement misleading because Vonage's software can still be internally developed and yet infringe on a patent already developed.  Patents only reserve to the patent holder the right to use the technology, but it does not preclude others from developing the same or similar technology.  Further, there is no allegation that Vonage copied or otherwise misappropriated its technology.

will nevertheless engage in the analysis of Negative Causation in the event Lead Plaintiff moves to amend its Amended Complaint.  As an affirmative defense, Defendants argue that even if Lead Plaintiff had sufficiently alleged disclosure claims against them, Counts I - III should be dismissed because it is apparent from the face of the Complaint that none of the investor plaintiffs' supposed losses stem from the revelation of the information that Lead Plaintiff identifies as being omitted from the Prospectus.  As a legal matter, however, section 11 plaintiffs do not have to plead loss causation.  In re Merk & Co., Inc. Securities Litigation, 432 F.3d 261, 274 (3d Cir. 2005).  Instead, "it is an affirmative defense in section 11 cases; defendants can limit damages by showing that the plaintiffs' losses were caused by something other than their misrepresentations." Id. (citing 15 U.S.C. § 77k(e)).  In other words, it is Defendants' burden to prove that negative causation exists, which will limit their damages.  In re Adams Golf, Inc. Sec. Litigation, 381 F.3d 267 (3d Cir. 2004).  The same pleading requirements exist for a § 12 claim.  In re Suprema Spec., 438 F.3d at 269-70.  Indeed, the Third Circuit has stated that loss causation, as an affirmative defense, may not be generally used to dismiss a plaintiff's complaint under Rule 12(b)(6).  Adams Golf, 381 F.3d at 277.

While the Third Circuit, in other contexts, has held that a "complaint may be dismissed under Rule 12(b)(6) where an unanswered affirmative defense appears on its face," Victaulic Co. v. Tieman, 499 F.3d 227 (3d Cir. 2007), in the securities

context, Defendants bear the burden of proving that the stock drop was caused by something other than the misleading registration statement.  As the court in <u>In re IPO Sec. Litig.</u> held, although section 11(e) does provide that damages should be reduced to the extent that loss is attributable to something other than a misstatement in the registration statement, that provision is an affirmative defense, with the burden of proof explicitly on the defendant. 241 F.Supp. 2d 281, 351 (S.D.N.Y. 2003)(citations omitted).  "Whether losses were attributable to other sources is necessarily a fact question; plaintiffs are certainly not required to plead that the offering price was artificially inflated in order to successfully state a Section 11 claim."  <u>Id.</u> at 351 n. 80; <u>see</u> <u>Herman & MacLean</u>, 103 S.Ct. 683 (plaintiff "need only show a material misstatement or omission to establish his prima facie case").

Furthermore, Defendants contend that Plaintiff's claims must be dismissed because plaintiffs in this case sold their shares prior to a corrective disclosure and thus have "no damages."  Due to the nature of the negative causation defense, section 11 can be said to create a factual presumption that "any decline in value is ... caused by the misrepresentation in the registration statement." <u>McMahan & Co. v. Wherehouse Entm't, Inc.</u>, 65 F.3d 1044, 1048 (2d Cir.1995) (citing <u>Greenapple v. Detroit Edison Co.</u>, 618 F.2d 198, 203 n. 9 (2d Cir.1980) ("plaintiff need show no causal connection between the decline in the price of the security and the materially false misstatement or omission")).  Thus, because an analysis of causation

is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial.  Levine v. AtriCure, Inc., 508 F.Supp. 2d 268, 273 (S.D.N.Y. 2007).  "To conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the burden of establishing negative causation from the defendants, where it properly lies."  In re WRT Energy Sec. Litig., No. 96 Civ. 3610, 2005 WL 2088406, at *2 (S.D.N.Y. Aug. 30, 2005).

In support of the contrary position, Defendants rely primarily upon In re Merrill Lynch & Co. Research Reports Sec. Litig., in which Judge Pollack granted a defense motion to dismiss a § 11 claim pursuant to Rule 12(b)(6) based on the absence of loss causation, after finding that the absence of loss causation was apparent from the face of the complaint.  272 F.Supp.2d 243, 255 (S.D.N.Y.2003). The court relied on a finding that the decline in plaintiff's share price was proportional to sector-wide declines and plaintiff's losses occurred before the first alleged disclosure of the omission. However, the court cited no other cases in which a Rule 12(b)(6) motion to dismiss was granted based on the absence of loss causation in a § 11 claim.  Defendants further rely on several additional cases dismissing § 11 complaints pursuant to Rule 12(b)(6) where the complaint failed to allege any corrective disclosures before plaintiffs sold their securities. See Davidco Investors, LLC v. Anchor Glass Container Corp., No. 04-2561, 2006 WL 547989, at *2 4 (M.D.Fla.2006); In re Alamosa, 382 F.Supp. 2d at 866; In re McKesson

-36-

HBOC Secs. Litig., 126 F.Supp.2d 1248, 1262 (N.D.Cal.2000).

However, these cases fail to recognize the possibility that declines in stock price prior to broad public disclosure may be reflective of leaking of relevant information into the marketplace, which is a fact-sensitive inquiry.  For example, in the present case, the Bustos litigation was filed on May 19, 2006 - prior to investors' sales of their securities.  If the omission of the fax service defect is material, Plaintiff may ultimately be able to show that investors had knowledge of the Bustos action prior to the time they sold their shares, which may have caused the decline in the price of Vonage's stock.  In the Court's view, failure to recognize the possibility of material information being released to the marketplace improperly ignores the presumption of causation, at least where declining prices prior to the sale of plaintiffs' shares are not shown to be consistent with sector-wide performance – a scenario which Defendants have not presented at this juncture.  See In re Merrill Lynch, 272 F.Supp.2d at 255 (dismissing § 11 claim at Rule 12(b)(6) stage where decline in plaintiff's stock value prior to first alleged disclosure was consistent with sector-wide declines).  Simply, at the Rule 12(b)(6) stage, Lead Plaintiff does not have the burden to present evidence demonstrating loss causation.  It should be noted in claims brought under § 10(b), that the burden of pleading and eventually proving loss causation is on the plaintiff and his or her failure to do so is proper grounds for dismissal.  In contrast, plaintiffs have no obligation to plead or prove

loss causation in § 11 or § 12 cases, rather, causation is presumed.  McMahan & Co., 65 F.3d at 1048.

### VI.    Vonage's Status Pursuant to the Securities Act

Vonage alternatively contends that Count IV fails to state a claim against it because Vonage did not offer or sell securities to Lead Plaintiff.  Under § 12(a)(2), a person who "offers or sells" a security by means of a misleading prospectus is liable "to the person purchasing such security by him."  15 U.S.C. § 77l(a).  The Third Circuit has interpreted this provision to require a relationship between a buyer and seller of securities that is "'not unlike traditional contract privity.'"  In re Westinghouse Sec. Litig., 90 F.3d 696, 715 (3d Cir. 1996)(quoting Pinter v. Dahl, 486 U.S. 622, 642 (1988)).  In so doing, the Circuit recognized only two types of sellers who have such a relationship with securities purchasers: (1) "one who passes title to the buyer for value (a direct seller)" ' and (2) one who "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner' (a solicitor seller)."  In re Westinghouse, 90 F.3d at 716 (quotations omitted).  Plaintiff alleges that Vonage was both a direct and solicitor seller.  However, Defendants contend that it is apparent from the face of the Complaint that Vonage was neither.

In In re Craftmatic Securities Litigation, 890 F.2d 628 (3d Cir.1989) the

Third Circuit cautioned that "the language of § 12, which makes a participant liable to the 'person purchasing such a security from him ...,' precludes actions against remote sellers, and focuses the inquiry on the relationship between the purchaser and the participant, rather than on the latter's degree of involvement in the transaction." <u>Id.</u>, 890 F.2d at 636 (citation omitted).  With regard to solicitation liability,  "although an issuer is no longer immunized from § 12 liability, neither is an issuer liable solely on the basis of its involvement in preparing the prospectus. The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller." <u>Id.</u> (citations omitted).

Notably, the court in <u>In re OPUS360 Corp. Sec. Litig.</u>, No. 01-2938, 2002 WL 31190157, at *10 (S.D.N.Y. 2002), opined that an issuer may be liable as a "solicitor seller" in a firm underwriting commitment:

> There are sufficient allegations that OPUS satisfies the second Pinter prong. It is significant that the officers and directors of OPUS signed the registration statement that is the basis of the plaintiffs' claim. <u>See Demaria v. Andersen</u>, 153 F.Supp.2d 300, 307-08 (S.D.N.Y.2001); <u>In re APAC Teleservice, Inc. Sec. Litig.</u>, No. 97 Civ. 9145, 1999 WL 1052004, at *11 (S.D.N.Y.1999). The signing of a registration statement is significant for purposes of finding that an issuer is a seller, even in the context of a firm commitment underwriting. <u>See Degulis v. LXR Biotechnology, Inc.</u>, No. 95 Civ. 4204, 1997 WL 20832, at *6 (S.D.N.Y. Jan.21, 1997).
>
> In addition, there are other allegations in the Complaint that OPUS through the Individual Defendants actively solicited the purchases made by the plaintiffs and were motivated by financial interest. The plaintiffs allege that the Individual Defendants participated in the preparation of the

Registration Statement and helped promote the IPO through various "road show" presentations . . . . The context of a firm commitment underwriting, an allegation that the defendant participated in the preparation of the registration statement and in road shows promoting the IPO, while motivated by the prospect for financial gain, is sufficient to constitute the active solicitation of securities. See Milman v. Box Hill Sys. Corp., 72 F.Supp.2d 220, 229-230 (S.D.N.Y.1999); In re Am. Bank Note Holographics, Inc. Sec. Litig., 93 F.Supp.2d 424, 439 (S.D.N.Y.2000). OPUS stood to obtain millions of dollars in the IPO, and the participation by its officers and directors in promoting the stock sale and preparation of the prospectus as well as the hiring of the Underwriters was motivated by the prospect of raising significant capital for OPUS, and constituted solicitation, regardless of whether OPUS actually interacted with the plaintiffs. Capri, 856 F.2d, at 478; In re Indep. Energy Holding PLC Sec. Litig., 154 F.Supp.2d 741, 761-62 (S.D.N.Y.2001); Milman, 72 F.Supp.2d at 230.

In re OPUS360, 2002 WL 31190157 at 10.

Here, the Amended Complaint alleges sufficiently that Vonage is a "solicitor seller." Specifically, the Amended Complaint alleges that Vonage actively solicited plaintiffs to purchase securities in the IPO for its own financial interest by preparing and publishing its Prospectus, see Compl., at ¶ 178, by "conducting various road shows and other promotional meeting[s]," see Compl., at ¶ 181, and by directly soliciting its customers to participate in the IPO through a "blast" voicemail and e-mail which announced the IPO and informed customers that they were eligible to participate in the IPO through the DSP program (this allegation is crucial to Plaintiff's DSP claims). In sum, the Court finds that these allegations read together sufficiently plead Vonage as a "solicitor seller." See Craftmatic, 890 F.2d at 637 (plaintiffs' allegation that Craftmatic defendants "solicited plaintiffs . . . to buy

Craftmatic common stock" sufficient); <u>see also</u> <u>Milman</u>,72 F.Supp. 2d at 229-230

(in a firm commitment underwriting finding allegations that issuer actively solicited

the sale of shares through participation in road show was sufficient to show seller

status); <u>In re Royal Ahold N.Y. Sec. & ERISA Litig.</u>, 384 F.Supp. 2d 838, 842-43

(D. Md. 2005)(finding in a firm commitment underwriting that issuer and its

officers actively solicited the sales of shares through their involvement in planning

and participating in the road show).

## V.    Counts VI and VII - DSP Claims

In Counts VI and VII, Lead Plaintiff asserts duplicative claims but under

different provisions of the Securities Act.[14]  In both counts, Lead Plaintiff contends

that Vonage illegally offered to sell stock to its own customers on May 8, 2006,

when Vonage sent its customers an email and a voicemail informing them that they

may be eligible to participate in the offering by buying shares from the underwriters

through the DSP and referring anyone who might be interested to a website for more

information.

As a preliminary matter, Count VI alleges that the notices, i.e., the email and

the voicemail, violated § 5, which prohibits the use of interstate mail and wires to

offer to sell securities without a prospectus meeting the requirements of § 10.  Based

---

[14]

As these two counts do not involve fraudulent and knowing acts or omissions, Rule 8
liberal pleading standards will apply.

on these allegations, Count VI is dismissed.  Vonage correctly points out that § 5 does not provide a private right of action.  See Sowell v. Butcher & Singer, Inc., No. 84-0714, 1987 WL 10712, at *2 (E.D. Pa. May 13, 1987), aff'd, 926 F.2d 289 (3d Cir. 1991)("Section 5 provides no private right of action . . . .").  In response, Lead Plaintiff concedes this point but argues that because it bases its § 5 claims on a cause of action arising out of § 12, which provides civil liability for § 5 violations, Lead Plaintiff has adequately alleged a violation of § 12.[15]  In light of this concession and case law, the Court will dismiss Count VI and incorporate the allegations in Count VI into Count VII.  See Ato Ram II, Ltd. v. SMC Multimedia Corp., No. 03-5569, 2004 WL 744792 (S.D.N.Y. Apr. 7, 2004).

Next, the Court will analyze the alleged illegal email and voicemail separately.  Lead Plaintiff alleges that the email that was sent to existing Vonage customers, soliciting them to purchase Vonage stock, was illegal because it failed to comply with the SEC's rules and regulations.  Neither party disputes the requirements incumbent on Vonage to solicit its existing customers pursuant to the Regulations.  Securities Act Rule 164(a), 17 C.F.R. § 230.164 states that "a writing prospectus, as defined in Rule 405, of the issuer . . . after the filing of the registration statement will be a section 10(b) prospectus for purposes of section 5(b)(1) of the Act provided that the conditions set forth in Rule 433 are satisfied."

---

[15]Lead Plaintiff has also made the same concession during oral argument.

Rule 164(a).[16]  Rule 433 requires that the email disseminated in this case must be "accompanied or preceded by the most recent [statutory] prospectus."  Rule 433(b)(2)(I), 17 C.F.R. § 230.433.

Based on the Regulations, Lead Plaintiff alleges that the email was not accompanied by a statutory prospectus because the hyperlink identified in the email did not directly lead to the most recently filed Prospectus. Compl. at ¶ 213.  Instead, Plaintiff alleges that the hyperlink directed potential investors of the DSP to the SEC's homepage, and because navigating through the SEC's homepage is unduly burdensome, it failed to permit effective communication to investors.  Vonage, on the other hand, argues that a statutory prospectus was properly included with the email by supplying the hyperlink pursuant to Note 1 to Rule 433 (b)(2)(I), 17 C.F.R. § 230.433 (the prospectus delivery requirement would be fulfilled by an active hyperlink to the Statutory Prospectus).  Vonage also relies on the SEC's interpretation of Rule 433 with respect to electronic media.  <u>See</u> SEC Release Nos. 33-77231 ("Use of Electronic Media for Delivery Purposes").  It maintains that the SEC has described acceptable ways of electronically delivering the Prospectus that would be consistent with the Regulations, and that Vonage's website adequately

---

[16]

A free writing prospectus is a written communication that "constitutes an offer to sell or a solicitation of an offer to buy the securities relating to a registered offering that is used after the registration statement in respect of the offering is filed . . . and is made by means other than (1) a prospectus satisfying the requirements of section 10(a) of the [Securities] Act." Rule 405, 17 C.F.R. § 230.405.

conformed to such requirements.[17]  Specifically, Vonage reasons that once investors signed on to the website, they either logged into the system as members, or they navigated through several screens and filled out pertinent personal information before the website led them to a prospectus page.  At that time, the investors had to check off a box online to acknowledge that they had viewed the Prospectus.  See, generally, www.vonageipo.com Webscreen Shots.  Since the Prospectus was included on that particular webpage in PDF and HTML formats,  see Id. at p. 20, Vonage urges the Court to find that this type of delivery conforms to the requirements of Rule 433.

---

[17]

 Notably, in its interpretation of Rule 433, the Commission states that it "would view information distributed through electronic means as satisfying the delivery or transmission requirements of the federal securities laws if such distribution results in the delivery to the intended recipients of substantially equivalent information as these recipients would have had if the information were delivered to them in paper form."  See SEC Release Nos. 33-7723l; 34-36345; IC21399 at 7.  Nevertheless, the Commission cautioned that "[t]he extent to which required disclosure is made, as opposed to the medium providing it, should be most important to the analysis of whether sufficient disclosure has occurred under the securities law."  Id. at 7-8.  "An electronic medium would not provide an adequate means for the delivery of required disclosure, and thus not serve the statutory purposes, if the medium does not permit effective communication to investors or is practically unavailable . . . . [T]he use of a particular medium should not be so burdensome that intended recipients cannot effectively access the information provided."  Id. at 8-9.  Moreover, Example 48 of the Release approves the following process, "Prospectuses and other materials are available through a computer server that requires users to obtain a user ID and password before they can access documents on the system.  The process for obtaining the ID and password requires significant information from the user and involves a delay of one day or even several days before the user can access the system."  SEC Release Nos. 33-7723l; 34-36345; IC21399 at 27.

The issues here for the Court's consideration are whether Lead Plaintiff has alleged that (1) the Vonage IPO website's hyperlink led Vonage Customers to the DSP website; and (2) the website contained a valid statutory prospectus.  As to the first inquiry, Vonage maintains that the email indeed included a hyperlink that directed investors to Vonage's IPO website, and that website included the Prospectus.  In support of its position, Vonage references the May 8, 2006 filing of the website content with the SEC.  <u>See</u> Reiser's Cert. at Exhibit F.  Specifically, Vonage points to page 20 of the Exhibit, which shows that a potential investor must have opened or downloaded an electronic copy of the Prospectus before participating in the DSP offering.[18]

On the other hand, Lead Plaintiff relies upon a letter, dated May 17, 2006, drafted by James Scott, on behalf of Vonage, to Ms. Michele M. Anderson of the SEC.  The letter stated the following, "As we have discussed, the Company's initial email communication to prospective participants in the Company's Customer Directed Share Program did not include an active hyperlink to the Prospectus contained in the Company's most recently filed Registration Statement.  As a result, the staff of the Securities and Exchange Commission . . . has indicated to us that the email communication might be viewed as not having been preceded or accompanied

---

[18]

The Court has the authority to review this type of documentation in connection with Rule 12(b)(6) standard, <u>see</u> <u>In re NAHC, Inc. Sec. Litig.</u>, 306 F.3d 1314, 1331 (3d Cir. 2002).

by a prospectus as required by Rule 433  . . . ."  <u>See</u> Mr. Scott's Letter dated May 17, 2006 at p. 1.  Furthermore, a letter was sent to Vonage from the SEC dated May 18, 2006, stating that "the hyperlink contained in the email and the first page of the directed share program website . . . led to the Commission's website at www.sec.gov and not directly to the [C]ompany's prospectus."  <u>See</u> SEC's Letter dated May 18, 2006.[19]

The Court finds that there is no basis for Lead Plaintiff to allege that the Vonage IPO website's hyperlink did not lead customers to the DSP website.  The email identified two different websites from which investors could obtain the Prospectus.   First, prospective investors could "read the prospectus in [the] registration statement and other documents Vonage Holdings Corp. has filed with the SEC . . . . [Investors] may get these documents for free by visiting EDGAR on the SEC web site at www.sec.gov."  <u>See</u> DSP Email dated May 8, 2006.  The second method is by visiting www.vonageipo.com, where investors could find "[further] information about the terms and conditions of the Directed Share Program,

---

[19]

It bears noting that in its Registration Statement No. 333-131659 dated May 22, 2006, Vonage stated that its "initial email communication to prospective participants in the Vonage Customer Directed Share Program and the first page of the website identified above (from which a reader could access a detailed 'frequently asked questions' section about Vonage Customer Directed Share Program) did not include an active hyperlink to the prospectus contained in our most recently filed registration statement relating to this offering as required pursuant to Rule 433 . . . . The email communication and the information on the first page of the website therefore might be viewed as not having been preceded or accompanied by a prospectus meeting the requirements of the Securities Act."  Registration Statement No. 333-131659 at 2.

including the eligibility requirements and the process for participating in the program." Id. Lead Plaintiff does not argue that the hyperlink or Vonage's DSP website, at the time the email was sent, were inoperative. In fact, when the Court pointedly asked counsel for Lead Plaintiff during oral argument whether the Amended Complaint alleges that the website or the hyperlink failed to work during the time the email was sent to the DSP investors, counsel confirmed that it had not so plead.[20] As such, Lead Plaintiff's own concession belies its allegations that the email did not include a valid hyperlink that lead investors to the DSP website.

Nevertheless, with respect to the second inquiry, i.e., whether the DSP website contained a valid prospectus in accordance with the Regulation, the analysis is not as straightforward as Vonage declares. While Vonage has submitted the SEC's Release interpreting Rule 433, which provides examples of effective communication by electronic delivery, at this juncture, the Court cannot determine as a matter of law that such interpretation is valid and binding.[21] Indeed, a court

---

[20] Indeed, the Amended Complaint only alleges that the Vonage website became inoperative on May 23, 2006. See Compl., ¶¶ 138- 143.

[21] According to the its website, the SEC fashions the Releases in the following manner: "The Commission occasionally provides guidance on topics of general interest to the business and investment communities by issuing "interpretive" releases, in which we publish our views and interpret the federal securities laws and SEC regulations. Below are brief descriptions of and links to recent "interpretive" releases." See http://www.sec.gov/rules/interp.shtml.

considers whether to apply an agency's interpretation "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in exercise of that authority." United States v. Mead Corp., 533 U.S. 218, 226-27 (2001). The so-called Chevron deference requires a two-step analysis. See Cheveron v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). If the consideration required by the first step leads to the conclusion that the applicable statute is silent or ambiguous with respect to the issue before the Court, the second step of the analysis requires the Court to defer to the agency's interpretation if it is "based on a permissible construction of the statute." Id. at 843. Simply, this "second step" of Chevron requires deference unless the agency's interpretation was arbitrary, capricious, or manifestly contrary to the statute. Chen v. Ashcroft, 381 F.3d 221, 223-24 (3d Cir. 2004). Essentially, this is an inquiry to determine whether the agency's interpretation is reasonable. Id. See Commonwealth of Pennsylvania v. Dep. of Pub. Welfare, 411 F.Supp 2d. 586, 596 (W.D. Pa. 2006).

By contrast, agency statements contained in opinion letters, policy statements, agency manuals, and enforcement guidelines lack the force of law and "do not warrant Chevron-style deference." Christensen v. Harris County, 529 U.S. 576, 587, 146 L. Ed. 2d 621, 120 S. Ct. 1655 (2000); Madison v. Res. for Human Dev., Inc., 233 F.3d 175, 185 (3d Cir. 2000); Mercy Catholic Med. Ctr. v.

<u>Thompson</u>, 380 F.3d 142, 154-55 (3d. Cir. 2004).  "To grant <u>Chevron</u> deference to informal agency interpretations would unduly validate the results of an informal process." <u>Madison</u>, 233 F.3d at 186.  The Third Circuit has made clear that agency interpretive guidelines "do not rise to the level of a regulation and do not have the effect of law." <u>Id.</u> (quoting <u>Brooks v. Village of Ridgefield Park</u>, 185 F.3d 130, 135 (3d Cir. 1999)).  As for the persuasiveness of agency interpretive guidelines, the Court has to rely on the framework laid out in <u>Skidmore v. Swift</u>, 323 U.S. 134, 89 L. Ed. 124, 65 S. Ct. 161 (1944).  <u>See</u> <u>Christensen</u>, 529 U.S. at 587; <u>Madison</u>, 233 F.3d at 186; <u>Thompson</u>, 380 F.3d at 155.  The <u>Skidmore</u> Court explained:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.

323 U.S. at 140.

Clearly, the Court must engage in a detailed analysis to determine whether the SEC's Release should be afforded the <u>Chevron</u> deference, and even if the deference is applicable, the Court must determine whether the Release is reasonable. These are fact-sensitive inquiries.  The Court has to determine whether the SEC's interpretation of Rule 433's requirement that the DSP email must be accompanied or preceded by a statutory prospectus runs afoul of the unduly burdensome standard, and whether the interpretation conforms to the statutory framework set forth by Congress.  "The weight of such a judgment in a particular case will depend upon the

-49-

thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Id.

On this Rule 12(b)(6) motion, the parties have not presented arguments on these issues. Without affording the parties the opportunity to make such presentation, it is premature for the Court to reach the merits here. Thus, the Court concludes that Lead Plaintiff has sufficiently placed Vonage on notice of its allegations that Vonage violated the Regulations; specifically, that its email was not properly accompanied or preceded by the Prospectus in violation of Rule 433.[22]

Moreover, the Court acknowledges that the correspondence between Vonage and the SEC regarding the legality of the email outlined certain concerns at the time the first DSP email was sent. In fact, Vonage, pursuant to the advice of the SEC, not only included these concerns in its Registration Statement and the Prospectus, but amended its website to address them. Although the Court does not weigh the probative value of these letters in connection with Lead Plaintiff's allegations, the Court does find that the letters, at the very least, highlight issues that the Court should not so hastily ignore. At this time, the Court is satisfied that Lead Plaintiff has sufficiently pled its email allegations against Vonage.

---

[22] This is not to say that, upon further briefing and analysis, such a determination could not be made as a matter of law.

Lead Plaintiff further alleges that the voicemail sent to existing Vonage customers (1) failed to provide the name and address of a person from whom the prospectus could be obtained; and (2) included additional information beyond that permitted by the rule.  Compl., ¶¶ 207-08.   As such, Plaintiff alleges that the voicemail did not qualify for the safe harbor afforded to communications that meet the requirements of Rule 134.  To the contrary, Vonage reasons that because the voicemail was sent after the dissemination of the email, the voicemail is properly accompanied or preceded by a prospectus.[23]  As such, Vonage argues that it did not have a duty to provide a name and address of a person from whom recipients could obtain a copy of a prospectus.  In further response to Lead Plaintiff's allegations, Vonage argues that the information contained on the website was limited to the Prospectus and other information describing the procedures regarding the offering and the directed share programs.

As alleged, on May 8, 2008, both the email and the voicemail were sent to existing Vonage customers.  Vonage's argument is that after the email was sent, but on the same day, the same Vonage customers received the voicemail.  Thus, Vonage concludes that the voicemail was accompanied or preceded by a prospectus, satisfying Rule 134.  Lead Plaintiff contends that this very argument, which assumes

---

[23] Rule 134, 17 C.F.R. § 230.134, requires an issuer to provide the name and address of a person from whom the prospectus could be obtained if the communication is not accompanied or preceded by a prospectus.  See Rule 134(c)(2).

the voicemail to follow the email and that the email was accompanied by the Prospectus, creates a disputed factual issue, and as such, is not susceptible to dismissal on Rule 12(b)(6) motion.  The Court agrees.  Vonage summarily refutes the disputed fact by citing to one of Lead Plaintiff's Exhibits, which is a self-serving letter written by Vonage's counsel to the SEC  (Letter stated that Vonage "believes the initial email communication sent to prospective DSP participants was accompanied by the Prospectus contained in the Company's then most recently filed Registration Statement . . . . The Company therefore believes that the voicemail, which was disseminated after the email, was preceded by the Prospectus."(emphasis added))  Whether or not the voicemail was sent after the email remains a disputed fact.  Indeed, the SEC sent yet another correspondence to Vonage further inquiring about the deficiencies after receiving Vonage's letter addressing SEC's initial concerns regarding the lack of a prospectus accompanying the voicemail.  See SEC's Letter dated May 19, 2006.

With respect to Vonage's second argument, according to the SEC, in the letter sent to Vonage dated May 18, 2006, Vonage acknowledged in its Registration Statement that the inclusion of the Internet Address in the voicemail might be viewed as incorporating into the voicemail information that is beyond the scope permissible under Rule 134.  See SEC's Letter dated May 18, 2006 at p. 2. Specifically, the email contained a "Frequently Asked Question" ("FAQ") link

appearing on the first page of the website (login screen).  Vonage urges the Court to find that the information found in the FAQ section permissible pursuant to Rule 134(a)(12)(communication may give a description of procedures regarding the offering and a directed share plan).[24]  At this stage of review, the Court does not engage in an analysis to find that the information contained in the FAQ section is conclusively permitted by Rule 134, especially since Vonage is relying on the Rule's safe harbor provision.  Also, whether or not all of the information included in the email is incorporated into the voicemail is a determination more appropriately made in a summary judgment motion where a further record may be presented to the Court.  At this stage, Lead Plaintiff alleges sufficiently that Vonage's "blast" voicemail did not conform to the requirements of Rule 134; thus, its claim under § 12 of the Securities Act remains.

Nevertheless, Vonage alternatively argues that even if the voicemail failed to meet all the technical requirements of Rule 134, the DSP plaintiffs may not be able to now claim that those technical violations entitle them to damages when they were made aware of those issues prior to the IPO and, nonetheless, decided not to exercise their right to withdraw from the offering. Vonage claims that on May 22,

---

[24] While Lead Plaintiff wrongly alleges in the Amended Complaint, paragraph 208, that the voicemail included information beyond the scope of SEC Rule 144, the Court finds this as a typographical error.  Indeed, paragraph 210 alleges the correct rule, i.e., Rule 134.  As such, should Lead Plaintiff choose to amend its Amended Complaint, Lead Plaintiff is directed to correct this error.

2006, it emailed a free writing prospectus to all DSP customers who had placed a conditional DSP offer which informed them of these issues and explained that the email and voicemail might be considered an offer to sell securities in violation of § 5.   Vonage further claims that, at that point, customers who had placed a conditional offer through the DSP still had the right to withdraw after having viewed the cautionary email.

The Court finds such argument unpersuasive.  First, even if the Court were to accept Vonage's waiver argument, the conditional offers became binding on May 23, 2006 - one day after the supposed email was sent to the customers.   Giving Lead Plaintiff every favorable inference, it is reasonable to infer that the DSP participants did not have sufficient time to rescind their conditional offer.  In fact, it is unknown at what time of day the email was sent on May 22nd, and whether it was hours or minutes before the start of May 23rd.  However, even without regard to the timing issue, Lead Plaintiff alleges that "[m]any participants of the Directed Share Program were unable to log onto the website to obtain timely information regarding their conditional offers for, or their actual transactions in, the IPO."  See Compl., ¶ 139.  Further, the customers "remain[ed] unaware that Vonage accepted their conditional offers and were thus improperly denied their right to withdraw their conditional offers."  Id.

In response to such allegations, Vonage counters that according to the

Amended Complaint, the date on which the website allegedly failed to operate properly was May 23, 2006.  Thus, the problems arose after the withdrawal period was over.  The Court finds that position unavailing at this point.  If the Court were to accept such argument, presumably, the participants of the DSP had only one day to rescind their offer.  Giving every favorable inference to the DSP plaintiffs, depending on when the cautionary email was sent, which is undeterminable at this point, and when the website failed to work properly, which is also undeterminable at this pleading stage, in the worst case scenario, the DSP participants would have had only a small window – perhaps only minutes – in which to read and understand the information, and then log onto the website to rescind their offers.  In addition, the Amended Complaint goes on to allege that not only did the website fail to work properly, but there was a notice deficiency as many participants of the DSP did not know that they even had the opportunity to withdraw their offers.  See Compl., at ¶¶ 139-142.  Therefore, the Court finds that Vonage's waiver argument does not preclude Lead Plaintiff from bringing a § 12 claim against Vonage at this stage.

## VI.    Counts VIII and IX

Count VIII alleges that the officers of Vonage, by virtue of their management position and/or stock ownership, have the power to influence and direct the activities of Vonage and thus are controlling persons of Vonage.  Lead Plaintiff maintains that by virtue of their positions, these officers are liable to the investor

plaintiffs.   Similarly, Count IX is asserted against the directors of Vonage for violations of Section 15 of the Securities Act.   Count IX alleges that the directors had the power to influence and direct the activities of Vonage, and thus they are controlling persons of Vonage.   To state a claim that an individual is liable as a control person under Section 15, a plaintiff must allege, among other things, a primary violation of the federal securities laws by the controlling person.   Klein v. Gen. Nutrition Cos., 186 F.3d 338, 344 (3d Cir. 1999).   At this point, the Court has dismissed Counts I - VI, and given Lead Plaintiff leave to amend the Amended Complaint with respect to the fax service and patent litigation allegations. However, because Count VII is still viable, and because Lead Plaintiff in these counts alleges sufficiently that the individual defendants (1) signed and were responsible for the truthfulness and accuracy of the Registration Statement; (2) had access to internal company information; (3) attended board meetings where the IPO was discussed; and (3) had the power to influence and direct Vonage, Lead Plaintiff has properly plead violations of section 15 against the individual defendants. Tellium, 2005 WL 1677467 at *23; In re MobileMedia Sec. Litig., 28 F.Supp. 2d 901, 921, 940 (D.N.J. 1998)(allegations regarding directors who signed the registration statements sufficient to plead section 15 liability).

An appropriate Order shall follow.


Dated: April 2, 2009


                                        /s/ Freda L. Wolfson
                                        Freda L. Wolfson, U.S.D.J.